[No. 110.  Decided March 13, 1891.]

JOHN EDWARDS v. THE STATE OF WASHINGTON.

HOMICIDE — CHANGE OF VENUE — WITNESS — ACCOMPLICE — CORROBORATION.

Under § 1073, Code 1881, vesting the matter of a change of venue in a criminal case entirely in the discretion of the trial court, the supreme court will not reverse a conviction, unless the discretion has been most clearly abused.

It is not error, under § 1092, Code 1881, to allow one indicted with the prisoner, but not put upon trial with him, to be used as a witness for the state prior to his discharge.

The evidence of an accomplice, uncorroborated in material matters, is insufficient to authorize a verdict of guilty, except in those cases where, from all the circumstances, the honest judgment is satisfied of guilt beyond a reasonable doubt. Under the facts in this case, it is held that the testimony of the accomplice in the murder is untrustworthy, and the facts claimed to be in corroboration of his story are wholly immaterial. (SCOTT, J., dissents.)

*Appeal from Superior Court, Pacific County.*

The facts are fully stated in the opinion.

*Caples, Hurley & Allen, Kannaga, Holcomb & Elwood,* and *F. D. Winton,* for appellant.

The refusal of the court to grant a change of venue was such an abuse of discretion that the supreme court ought to review the same. *State v. Nash,* 7 Iowa, 347; *Simmerman v. State,* 16 Neb. 615; *State v. Billings,* 77 Iowa, 417.

Courts as a general rule will set aside a verdict rendered upon the unsupported testimony of an accomplice. Whart. Crim. Ev. (8th ed.), 441, note 3; *Ray v. State,* 1 G. Greene, 316 (48 Am. Dec. 379); *People v. Evans,* 40 N. Y. 1; 1 Bish. Crim. Proc. (3d. ed.), 1169; *People v. Eckert,* 16 Cal. 111; *People v. Ames,* 39 Cal. 403; *Middleton v. State,* 52 Ga. 527; *State v. Moran,* 34 Iowa, 453; *People v. Thompson,* 50 Cal. 481; *Dill v. State,* 1 Tex. App. 287; *People v.*

*Elliott,* 106 N. Y. 288; *Buchanan v. State,* 24 Tex. App. 195; *Welden v. State,* 10 Tex. App. 400; *Gillian v. State,* 3 Tex. App. 133; *Hoyle v. State,* 4 Tex. App. 239; *Jones v. State,* 4 Tex. App. 437; *Simms v. State,* 8 Tex. App. 230; *Roach v. State,* 4 Tex. App. 478. Corroborating testimony must be such that, standing alone, it in some manner tends to connect the defendant with the commission of the crime. 1 Bish. Crim. Proc., 1173; *State v. Odell,* 8 Or. 30; *People v. Thompson,* 50 Cal. 480; *McCalla v. State,* 66 Ga. 346; *Craft v. Commonwealth,* 80 Ky. 349; *People v. Ames,* 39 Cal. 403; *Miller v. Territory,* 3 Wash. T. 554; *State v. Hunsaker,* 16 Or. 497; *State v. Cody,* 18 Or. 506; *Pitts v. State,* 43 Miss. 472; *People v. Lewis,* 36 Cal. 531; *State v. Chyo Chiagk,* 92 Mo. 395; 2 Russ. Crimes (7th ed.), 963.

*George J. Moody,* Prosecuting Attorney, *Fulton Brothers,* and *A. G. Hardesty,* for the State.

Granting or refusing a change of venue is a matter within the discretion of the trial court. *Findley v. State,* 5 Blackf. 576; *Sumner v. State,* 5 Blackf. 579 (36 Am. Dec. 561); *Reynolds v. United States,* 98 U. S. 165; *Ward v. Moorey,* 1 Wash. T. 104.

The fact that no difficulty occurred in selecting a jury shows that there was not just foundation for the application, and that there was no abuse of the discretion vested in the court. *Watson v. Whitney,* 23 Cal. 378; *State v. Reno,* 41 Kan. 674 (21 Pac. Rep. 806); *State v. Gray,* 19 Nev. 412 (8 Pac. Rep. 456); *State v. Millain,* 3 Nev. 433; *People v. Plummer,* 9 Cal. 299; *People v. Mahoney,* 18 Cal. 180; *Wright v. Commonwealth,* 33 Gratt. 880; *Hunter v. State,* 43 Ga. 483.

The appellate court will not interfere with the action of the trial court in refusing a change of venue on account of the prejudice of the inhabitants of the county, unless it appears there was a palpable abuse of discretion, and that injustice has been done. *State v. Guy,* 69 Mo. 430; *State*

*v. Burgess,* 78 Mo. 235. Where the application for the change is met by counter-affidavits of citizens from various localities in the county, showing non-existence of prejudice, the denial of the application is not reversible error. *Price v. People,* 23 N. E. Rep. 639; *State v. Cadwell,* 44 N. W. Rep. 711; *State v. Kennedy,* 77 Iowa, 208; *State v. Perigo,* 70 Iowa, 657; *People v. Goldenson,* 76 Cal. 328.

There is no statute in this state requiring corroboration of an accomplice's testimony, and at common law no corroboration was required. Roscoe, Crim. Ev., 132; Whart. Crim. Ev., 441. The evidence, if standing alone, is not to be rejected, and whether corroborated or not (and to what degree it needs corroboration the jury must judge), may be sufficient to satisfy the minds of the jury. *State v. Stebbins,* 29 Conn. 463 (79 Am. Dec. 223); *People v. Costello,* 1 Denio, 83; *State v. Holland,* 83 N. C. 624 (35 Am. Rep. 587); *Com. v. Price,* 10 Gray, 472 (71 Am. Dec. 668, note p. 671); *People v. Gallagher,* 75 Mich. 512; *People v. Jenness,* 5 Mich. 305; *Wisdom v. People,* 11 Colo. 170 (17 Pac. Rep. 519); *People v. Kunz,* 73 Cal. 313; *People v. Schweitzer,* 23 Mich. 301; *Foster v. People,* 18 Mich. 271; *Fisher v. People,* 20 Mich. 135; *Halilton v. People,* 29 Mich. 188; *Black v. State,* 59 Wis. 471; *Olive v. State,* 11 Neb. 1; *Ingalls v. State,* 48 Wis. 647.

The opinion of the court was delivered by

STILES, J. — The appellant was indicted jointly with John B. Rose, George F. Rose and James E. Gibbons for the murder of Sina Frederickson, near South Bend, in Pacific county, on Thursday, January 30, 1890, and was tried separately. Before the trial a motion to change the place of trial to another county, on the ground of prejudice on the part of the community against the accused, supported by numerous affidavits, showing the circulation of some intemperate newspaper articles among the people of the county, and considerable hostile feeling in the neighbor-

hood where the alleged crime was committed, was made and denied. But, inasmuch as the statute (code, § 1073) seems to vest the matter of a change of venue in a criminal case entirely in the discretion of the trial court, we should not feel warranted in reversing a conviction, unless the discretion had been most clearly abused. Here, however, but twenty-six jurors were examined, and there is no complaint of any misconduct on the part of the jury selected. It seems to be probable that, while it was true that the persons qualified to act as jurors who lived in the vicinity of South Bend woud have been very few by reason of the excitement they were under, still there was a large portion of the county, from which the jury was actually drawn, where the excitement did not exist.

The prosecution in this case relied entirely upon the testimony of George Rose. Without his statement there were some circumstances which might have pointed to the accused as the person, or one of the persons, who had committed the homicide; but, under the theory of the state upon the trial, these circumstances were entirely laid aside, and became of no value. George Rose was the first witness called for the prosecution, and the defense at once objected to his being allowed to testify, on the ground that, being jointly indicted with the prisoner on trial, he could not be a witness until he had been discharged. The court overruled the objection, and permitted him to testify, which appellant urges as error. But under the liberal system we have, which permits almost every person to testify in any cause, whether civil or criminal, we think it was not error to allow one indicted with the prisoner, but not put upon trial with him, to be used as a witness. The language of § 1092 of the code is: "When two or more persons are included in one prosecution, the court may, at any time before the defendant has gone into his defense, direct any defendant to be discharged, that he may be a witness for the territory;" and it will thus

be seen that we interpret the word "prosecution" to mean "trial." It can work no substantial injury to the accused whether the witness has been discharged or not. While still under indictment, the witness cannot be used as such, unless by his consent, and by his willingness, and his voluntary act of testifying; which he should never be allowed to do unless it is clearly necessary for the case of the state. He earns the equitable right to a discharge, which will always follow where he has been straightforward and honest with the court; whereas, on the other hand, if he has been discharged, and then in his testimony plays false with the court, the order of discharge will be set aside, and he will be put upon trial, even on his own confession. Therefore the temptation to press hard upon the accused in giving his testimony is equal in either case, and his credibility, not his competency, must be the point of attack.

The deceased, Sina Frederickson, was undoubtedly the victim of a most brutal murder, somewhere near the time alleged (January 30, 1890), and it is almost equally certain that at nearly the same time, and by the same hand or hands, her husband, Jens Frederickson, met a like violent death. Both were probably instantly killed—she by a rifle bullet, he by a load of small shot and percussion caps; both being shot through the head. Their bodies were found about a mile apart—hers being buried under the refuse of a hog-pen upon the premises of John B. Rose, near the shore of Shoalwater Bay, about four miles below South Bend, and on the opposite side of Willapa river; and his being laid in a trail made by cattle, close to some large logs, further to the west, and within a few rods of high water mark on the bay. The grave in which Mrs. Frederickson was buried had been excavated to a depth of two or three feet; but her husband lay in the hollow made by the cattle in jumping over the logs where the ground was swampy, and was covered by very little earth and some coarse sods, just

enough to hide him. His body was discovered accidently by searchers, while hers was pointed out by George Rose, when all the efforts of the searchers to find it had failed. These two unfortunate young people, only a month before their death, had taken up their residence upon certain government land adjoining the land of John B. Rose, and were living in a boat-house floated upon some logs at high water mark. The land had been previously several times occupied by different claimants, who had abandoned it, and Frederickson intended to prosecute a contest in the land office to clear the record of former filings. The Rose place consisted of something over a hundred acres, and had upon it a farm house and outbuildings, an orchard, etc. It had been settled for many years, and was used by Rose as a place to keep cattle and poultry, and for the raising of supplies for his hotel in South Bend, where he lived. No other person lived in the vicinity of this land, and the country around was wild, rough and uncultivated. The only means of travel to it seems to have been the waters of the bay and river. Edwards, the appellant, was a young man, employed by Rose to attend to the cattle and other property at the ranch, and lived there alone; but it had been for some time arranged that he should quit his employment, and a man named Prickett, with a family, had been engaged by Rose to take his place. Edwards left this ranch on Sunday, February 2d; and in all probability, had it not been for the revelations of George Rose, he would have been more than suspected of this double crime, although the body of the woman might never have been found. But, as will appear in the aspect in which the case was presented at the trial, this presence of Edwards so close to the scene of the crime, and so near the time when the Fredericksons were missed, cut no figure at all as a circumstance tending to prove his guilt.

George Rose was the first witness for the state, and the

only witness, excepting those who were called to corrobo-
rate him by showing the language and actions of Edwards
after he was suspected of participation in the crime.  After
stating that he was eighteen years old, and that he knew the
Fredericksons, he was asked to tell the story of the killing
of the Fredericksons in his own way, which he did in these
words:

"Well, on the 29th day of January father came to me
in the evening and says to me he wanted me to go down to
the place the next day with him to look after some cattle.
And Ed. Gibbons stood about ten or twelve feet from him,
and he said he would like to go down with us.  So the
next morning we went down, about half past 6 o'clock in
the morning — left South Bend.  And all three went down
to the place, and when we got down there we saw Edwards
was there; and we went in the house, and father and
Gibbons and Edwards was standing there talking awhile in
front of the house, by the gate.  Father says to Edwards:
'You better go up and get Frederickson to help bring the
cattle down;' so father and Edwards went off after Fred-
erickson, to bring the cattle down, and brought him down,
and went down after the cattle.  And we walked along the
bluff, and there was a hawk set up on a tree, and Gibbons
says to me, 'Give me your gun, and I will see if I can kill
that hawk;' and I let him have the gun, and after he shot
the hawk he kept the gun, thinking he might see some
geese to shoot at; and we walked down until we got down
by the cow trail, and Gibbons walked ahead, father next,
and I was behind father, and Frederickson behind.  And
I heard Gibbons say to Frederickson, 'Look here, Fred-
erickson,' and just then he shot; and I turned around and
said, 'That's a pretty way to use a man after calling him
to help drive the cattle up;' and Gibbons says, 'That's the
kind of cattle we came down after.'  I told him if I had
known that I would not have come down with them.  So
after Gibbons shot Frederickson, Edwards walked into the
brush and got a spade out and began to look around for a
place to bury him; and it was in the cow trail; and father
says, 'That's good enough place right here;' and Edwards
went to work and dug the grave, and I went off ten or

fifteen feet from where they was, and sat down on a log, and never looked up at them until after they had the grave ready, and called me to help lay him in the grave. They had his gum boots pulled off and gum coat, and laid them down where he was dropped; and I helped put him in the grave, and throwed over what loose dirt there was, and then they pulled some grass sod up and put it on top of him; and after that father picked up his gum coat and boots and throwed them down in the slough as we walked along about a hundred yards from where he was buried; and we walked up to the house, and as we got along the beach father said, 'Better hurry up and get Mrs. Frederickson down; she may suspect something—go away; so they went up and got Mrs. Frederickson, and when we were going by the house Edwards said to me, 'Give me your shotgun.' I told him I would not let him have it, and father commenced cursing and swearing at me because I would not let him have it; and Edwards said, 'I will go and get the rifle; don't make any fuss about it;' and they was gone up after Mrs. Frederickson about twenty minutes; and I heard some one scream, and I went out and looked, and saw her coming along the fence; father had hold of one arm, and Edwards had hold of the other; dragging her through the mud-hole; and after they got through the mud-hole Edwards walked ahead and father walked behind, and just as they got inside the gate Edwards picked up the rifle and walked up about ten feet from the gate, and Mrs. Frederickson got inside, and asked what they had done with her husband. Edwards says, 'We shot him;' and she says, 'Then kill me; I don't want to live any longer;' and Edwards raised the rifle and shot her, and they buried her right there behind the pig-pen, and Edwards dug the grave; and after the grave was dug father called me to help put her in the grave; and I came up to help put her in the grave; and we covered her up, and threw some sods on top of her, so they would not see the loose dirt; and father and Edwards came back to Frederickson's house, and locked the door; and when they came down Edwards carried the shotgun, and Gibbons carried the revolver; and father called me out to the front of the house by the gate, and he had $50, and gave it to me, and

he said if he ever found out that I told this on him I would be dead first; and, furthermore, if I went down to the place next week, and it came up stormy, and anybody asked what became of Fredericksons, to say that I saw them go out the day of the storm; and before we left that evening Gibbons gave me the revolver. I told him that I did not want it, but he gave it to me, and I kept it until the next ———. We, father, Gibbons and I, left the place about 5 o'clock that afternoon, and got up to South Bend about half past seven, and had supper by ourselves, my sister Frances preparing it. Edwards stayed at the house. He was to take the boat (Frederickson's) and put it out and sink it that night in the river; swamp it."

Asked what any of them stated as the reason for killing these people, he said, "Well, father wanted to get that 160 acres of land there, is the reason he killed them;" and that, in December previous, Edwards had cleared a spot on the Frederickson land to build a house on, and told Rose he would take the place for him.

We have given this statement in full, in the words of the witness, for the reason that, taken with the other facts in the case, it is one of the most remarkable cases in the history of criminal law. Here is a boy of eighteen, who accuses his father, a man past seventy years of age, of planning and executing this horrible crime, and of carrying his son into it, as a witness of a double murder, for the pitiful motive of clearing the way to the possible acquisition of a parcel of almost worthless land, at the same time that neither the father, Edwards nor Gibbons provides himself with any weapon whatever when going on their expedition of murder, but depends entirely upon the chance shotgun in the hands of the boy. George, on cross-examination, admitted having had in his possession a pistol belonging to Frederickson; that it had had a leather handle; that he had cut the leather off, and also Frederickson's initials from the wood beneath the leather; that he kept it under his bed, where his mother found it; and that, in response to his

father's question where he got it, he had answered that he
bought it of a man at South Bend. He also stated that he
had been to the ranch with one Conley on Saturday, Feb-
ruary 1st, to assist Edwards in killing a beef; and that on
Saturday afternoon, having got "pretty full of liquor," he
went down to the ranch in his boat to take Edwards' place
until Prickett should arrive, and remained there alone Sun-
day and Monday. It further appeared that George, shortly
after his return from the ranch on Monday, had mentioned
in the hearing of various people, that he had seen the
Fredericksons go out on the bay in their boat and dis-
appear in a sudden squall. This set the people of South
Bend to searching for the bodies, with the result of finding
Frederickson in the latter part of February. Suspicion
was immediately directed towards George Rose, and he
was arrested and charged with the crime of murder. Then
began, on his part, a series of statements and confessions,
which continued until March 31st, each being different from
all the others. At various times he admitted having done
both the murders himself on Sunday, February 2d, his
excuse being that he had been very drunk, and the circum-
stances that he had procured Frederickson to go out with
him to relieve some cattle that were mired, when, being
behind him, he had said, "Look here, Frederickson," and
when the latter turned around he had shot him down; that
he had gone to the Frederickson house and told Mrs.
Frederickson that her husband had hurt himself, so that he
could not get away from the Rose house, whereupon she
accompanied him to the ranch and was there shot by him
with a rifle left in the house for killing cattle; and that he
had returned to the Frederickson house, got the pistol and
some money there on a shelf, and locked the house, after
which he buried the bodies. Again, he charged Edwards
with the whole crime, alleging that he had found it out by
seeing the fresh earth near the hog-pen and digging down

until he came to the body of Mrs. Frederickson, and that when Edwards became aware that he knew it, the former charged him to tell the drowning story. Still again, he said that some otherwise unknown person named Andrew Johnson persuaded him to help kill the Fredericksons, and that they did it at Frederickson's house, carrying the bodies away the next day, February 3d. On the 29th of March the Edwards statement was reduced to writing and signed by George Rose, and witnessed by the sheriff and his deputy. On the 30th of March the Johnson statement was likewise signed and witnessed; and on the same day, but later, he made another written statement, in the main corresponding to his testimony in chief at the trial, which was witnessed by the attorneys for the prosecution, the sheriff and another. On the 31st day of March he again took the crime upon himself, in conversation with appellant's counsel, saying that he had implicated the others because the officers would not listen to him when he said he did it alone, but insisted that he had others with him in the murder. At the preliminary examination on April 3d, he confirmed his last written statement and seems to have rested with that until about one week before the trial when, the sheriff having for some reason taken him upon the Rose ranch, he, in the presence of the sheriff and his deputy, reiterated the story that he had himself killed the Fredericksons, and illustrated how it was done. To the making of all these statements the witness excused himself by claiming that, in the *first* place, his attorney (who was not the attorney of any of the other defendants) had told him that if he told different stories the state would not be able to catch him on any of them, and thus he would get off; *secondly,* that the defendant's counsel had told him, after he had made his written statements, that if he would take all the trouble upon himself, that would clear the others, and then they would turn about and help him to get off.

The prosecution maintained that the second written statement of March 30 was a true one, and, for the purpose of showing wherein it differs from George Rose's testimony, we shall here include a part of it, as follows:

"My name is George Rose. My age is nineteen years. My father's name is John B. Rose. My father wanted this 160 acres of land that Jens Frederickson took. He wanted Edwards or Gibbons to take it, and pay out on it, and then deed it to my father. They, Gibbons (who is one of the meanest men ever came into the country) and Edwards and my father all made it up as to how they would kill Frederickson and his wife. After Edwards made up his mind to take the place for father, he cut down some trees on the place, but father found out after Frederickson had built a shake shanty on the claim, that Frederickson had commenced a contest to get the land. On Wednesday or Thursday of the last week in January, father, Gibbons and I took a dingey, and crossed the bay to father's ranch, where we found John Edwards. We had it all made up as to how we were to do the killing."

Now, in his testimony George repudiates all knowledge on his part of the purpose of the party up to the instant when Frederickson was shot, whereas in the statement he shows full participation in the scheme before they left South Bend; the bearing of which is, that under the statement he was not only an accessory before the fact, but an active *particeps criminis*, whereas, according to his testimony, he was the innocent victim of association, who protested to the extent of refusing his gun at the assassination of the woman, and afterward merely endeavored to shield his father, which he had a right to do under the statute. His testimony was, therefore, in the presence of his statement, all the more carefully to be scrutinized, as, if believed as he gave it, it exonerated himself from all responsibility for these two crimes, at the expense of his father and the other two men.

On Sunday, February 2, Edwards went, by way of As-

toria, to Portland, where he remained a few days and then returned to South Bend and the vicinity of Shoalwater Bay. Suspicion had been roused against him in connection with the Fredericksons, and he became aware of it. But he did not go away, and on the 17th of March he was at Willapa City, a small village. He was drinking, and there were several men in and about the saloons that he visited who sought to get him to commit himself in some way by trying to lead him to talk of the Fredericksons, and by listening to his maudlin talk as he sat dozing in drunken stupor over a stove. He evidently knew when awake what they were driving at, and sought to avoid them. But out of it all he seems to have said to one person, "I'm in trouble; I'm watched, and I want to get out of this country;" and when told he mustn't mind such things, he answered, "You would if you were in my place." Another questioned him about the Frederickson land, whereupon Edwards said: "I suppose you have heard about those people being drowned there? Yes, they were drowned, because I was there two days after they were drowned. Oh, that poor woman!" the last expression, as he leaned sorrowfully toward the witness. A third heard him say, as he sat nodding by the stove: "I might kill a man, but I couldn't kill a woman." The same witness described him as staggering drunk. A fourth witness heard him say: "That's all right, Frederickson; that's all right." In the hearing of a fifth he said: "Why, damn it, I didn't kill the woman; I couldn't do such a thing." All this was occurring from 3 o'clock in the afternoon until 3 o'clock the next morning; but nothing more definite than this came out of it. At another time a witness testified he had been talking to Gibbons and John B. Rose in the jail, and both were protesting their innocence; "and the defendant (Edwards) there was sitting with his back toward me. He didn't look at me, but says he: 'I am innocent of this mur-

der, but I would like to tell who the guilty parties are.'"
The witness interpreted this as an expression of a desire
on the prisoner's part to make some statement, and so told
the sheriff, who at once saw Edwards and asked him if he
wished to say anything. He said he did not, and denied
having used the expression attributed to him. Although
George Rose did not testify to anything of the sort, the
court allowed the prosecution to show that, within a few
rods of where Frederickson's body was found, some time
in March, persons had noticed a rectangular hole at the
shore end of a little slough. It was about the size of an
ordinary grave, and the tide flowed in and out of it from
the slough. Its sides looked as though they had been dug
with a spade. But George Rose did say that Edwards had
got a spade out of the brush near there, within a few min-
utes after Frederickson was shot. Therefore the argument
was that this hole was a corroboration of the spade part of
George's testimony, as well as that this was really a grave
dug for the reception of a corpse by Edwards. The same
witness, moreover, stated that John Rose, when spoken to
about the hole, said that a cow mired there and had been
dug out.

We have now stated the substance of all the prosecu-
tion's testimony in the case, and it would seem that it was
all that it was possible to produce, as extraordinary efforts
were made by the authorities and citizens to secure the con-
viction of the parties guilty of the Frederickson murders.
During a part at least of the five months from the time of
his arrest to the trial of Edwards, George Rose was the
willing assistant of the prosecution, able, certainly, and
presumably ready, to point out every circumstance which
would tend to corroborate his statement. Able counsel
were employed to assist the state's prosecutor, both in de-
veloping testimony and in trying the case. But to our
minds the case went to the jury upon the testimony of

George Rose absolutely uncorroborated in any particular whatever; for the drunken whinings of Edwards in the Willapa saloons, even though they contained within them anything more damaging than the maudlin protests of one believing himself surrounded by suspicious enemies, were not corroboration of anything testified to by George Rose, nor did they show any admission or knowledge of any fact connected with the crime charged. The court below apparently thought differently, for a motion to direct an acquittal at the close of the state's case, on the ground that there was no corroboration of George Rose, was denied, although the court in its charge to the jury ruled strongly that, to convict one charged with crime upon the testimony of an accomplice, the accomplice must be corroborated in some material matter tending to show the accused to have been implicated in the commission of the crime. Still, it may be that the court meant to leave it to the jury to say whether George Rose was or was not an accomplice at all; as, if full credit were given to his statement, we have shown that he was guilty only of concealing a crime of which he was a witness, but in which he did not participate. This state of things must appear remarkable to any one looking at this case dispassionately. John B. Rose was a man seventy years old, who had resided in and near South Bend many years. He kept a hotel at which some forty people were regular boarders, and was well known to everybody about there. Edwards we have somewhat described. Gibbons was a young man who had, within three weeks only, come to the neighborhood a stranger, boarded at the Rose house, and was engaged with several others in slashing timber near the town. Yet not a single witness was called by the state to show that these men had been seen talking together at any time, or leaving in a boat upon the river, or returning from the river, or taking a supper alone, or in any way consorting together as men having some com-

mon purpose of so serious a character as murder in view; something of which, if there had been anything as described by George Rose, must have been developed in the excitement which followed upon the discovery of the foul murder of these two young people.

Upon this appeal the state seems to concede that George Rose was an accomplice; but it maintains that, in the first place, there was some corroboration; and that, secondly, no corroboration was necessary in law, but that the uncorroborated testimony of an accomplice in this state goes to the jury like the testimony of any other witness, and that the court is bound by the verdict equally as though the witness were in no way complicated with the body of the crime. We have shown how we regard the matters which are claimed to be corroboration; that they are wholly immaterial. As to the other point, it is true that we have no statute requiring the corroboration of an accomplice, such as is found in a few of the states. It is also true that at common law conviction upon the unsupported testimony of an accomplice was upheld to the extent, at least, that, although the higher courts and law-writers laid it down that a trial court ought to advise the jury not to convict on such testimony, it was not reversible, even if they did not so advise. Yet the books are full of cases from courts not bound by any statute, both in England and America, where corroboration has been held necessary. 1 Amer. & Eng. Enc. Law, tit. "Accessory," § 18, p. 74. Cases are rare, indeed, where, if the prosecutor has the assistance of a willing accomplice, no corroborative testimony can be produced. In practice it is almost invariably attempted, and juries are told, as in this case, that unless there is corroboration they should acquit. Perhaps the true view of the matter is that in many, if not in most cases, the evidence of an accomplice, uncorroborated in material matters, will not satisfy the honest judgment beyond a reasonable doubt, and that

it is clearly insufficient to authorize a verdict of guilty. But there may occur other cases where, from all the circumstances, the honest judgment will be as thoroughly satisfied from the evidence of the accomplice of the guilt of the defendant as it is possible it could be satisfied from human testimony; and in such cases justice demands that the evidence be accepted, so far as the court is concerned. *Collins v. People,* 98 Ill. 584 (38 Am. Rep. 105). The testimony of George Rose was not of the latter class, and the court below did right to charge the jury not to convict without corroboration. Here was a boy of eighteen or nineteen years, who was precocious enough to get "full of liquor;" who never went anywhere without a gun; who, upon his admission made, saw these persons killed; who had the money of Frederickson and his pistol; who slept soundly for two nights alone in the ranch house within a few feet of where Mrs. Frederickson lay buried in filth; who spread the news of the drowning of the Fredericksons; who told his stories without number, and equally varied; who stood by with unmoved calmness when strong men sickened in their labor of removing the dead woman from her horrible grave, and would himself have assisted but that the sheriff prevented him; who never suffered a tremor when he encountered his father after implicating him in so desperate a toil; and who, in the course of a trial lasting a week, was apparently the coolest person in the court-room, admitting frequent falsehoods, but sticking hard to his ghastly story. To say that such a witness should not be distrusted would be to mock at justice, and fling men's lives to the wind. John Edwards may be guilty of participation in this murder, but it is beyond human credibility that George Rose's story should be taken as true in any material particular, unless it be against himself, while it is unsupported by some credible testimony.

We shall not allude at any length to the defense, which

was entirely devoted to proving an *alibi* for George Rose, John B. Rose, and Gibbons. Edwards was, confessedly, at the Rose ranch on Thursday, January 30th. But a dozen or more persons testified that John B. Rose was sick with "la grippe" from Sunday the 26th to Friday the 31st, and that he was confined to his room all day of the 30th; that George was at home Thursday and Friday, doing chores about the house and in the village; and that Gibbons was at his work slashing all the week. Many of the witnesses were clear as to the date, fixing it with reference to the closing of the village school, which occurred Friday afternoon, with an exhibition which George attended, and which he helped arrange for the day and evening before. The teacher, a young lady from Oregon, boarded at the Rose house, and to her the state accorded worthiness of belief. The others were less positive; but the jury evidently disbelieved them all, and gave full credence to George Rose. The verdict was guilty, and the sentence death. For the verdict we see no way to account, except upon the theory that the jury totally misconstrued the value of the testimony offered in corroboration, which they might well do, in view of the court's refusal to direct an acquittal; or there was such prejudice and passion created in their minds that they were incapable of rendering a verdict according to the evidence. There were many assignments of error which we have not touched upon, but we are so thoroughly satisfied that the appellant should have a new trial, on the ground referred to, that it is not necessary to consider them. The judgment is reversed, and a new trial granted.

ANDERS, C. J., and DUNBAR, J., concur.

SCOTT, J. (*dissenting*). — I dissent. I do not think this is a case that should be reversed upon the question of fact. The record discloses no error. There was some corroborating evidence to support the testimony of George Rose, and

it, with his testimony, was all before the jury for due consideration. Simply because reading the testimony now might not convince one of the guilt of the defendant, will not warrant a reversal. The jury had the advantage of seeing the witnesses upon the stand, and hearing them testify, and the jury's judgment of the facts is the safest to follow. It is going too far to say that there was no sufficient proof of guilt upon which a conviction can be based. I think the evidence for the prosecution shown by the record will bear a more favorable statement than is given in the majority opinion; but, as the case is to be retried, it is perhaps best to refrain from any extended *contra* argument upon the proofs. However, the fact, if it is a fact, that none of George Rose's statements wherein he charged the accused with the crime were entirely true, does not afford ground for reversing the case. He was a man of hardened and abandoned character, and, it seems, at no time repentant, but his conduct does not show that he was especially desirous of shielding himself, although at times such a desire may have operated upon his mind, and in this regard a plausible reason is given for his contradictory statements. That he implicated the others for the reason he is said thereafter to have given, that the officers would not believe him when he said he committed it alone, and insisted that he had assistance, is very unreasonable. At the trial he was kept upon the stand a long time, and was subjected to a rigid and lengthy cross-examination. His testimony in the main was consistent, and there is much that can be said in favor of the truthfulness of his statement as finally given; but quite likely he was actuated at the last moment, when confronted with the solemnity of a trial of that kind, with a desire to shield himself and his father as much as possible, by showing no previous knowledge of his own, and imputing the actual killing to Edwards and Gibbons. The *alibi* the defense undertook to

establish was not conclusive; most of the testimony relating thereto might have been true, as it probably was, and yet sufficient time left for the commission of the murders on the morning of January 30th, as alleged.  These murders, if committed as claimed, were no doubt under previous consideration for some time by some of the parties.  John B. Rose's sickness might easily have been feigned.  The corroborating testimony may all have been subject to some explanation compatible with innocence, but the jury had all of this before them, the judge was a competent and careful one, the defendant was assisted by able attorneys, and he apparently had a fair trial, and I do not think the verdict and judgment should be disturbed.  Human tribunals are faulty at best, and it is impossible in a case like this to approach absolute certainty, but every protection is thrown around the accused under our system of criminal jurisprudence, and the liability to err against him upon the question of fact, while possible, is very remote.  Only in extreme cases should the appellate court interfere to set aside a conviction upon that ground, and this is not such a case.