[No. 25798. *En Banc.* March 24, 1936.]

THE STATE OF WASHINGTON, *Respondent*, v. CALVIN GUTHRIE *et al.*, *Appellants.*[1]

[1]Reported in 56 P. (2d) 160.

*Henry Arnold Peterson, Flood, Lenihan & Ivers,* and *Leo McGavick,* for appellants.

*Harry H. Johnston, J. W. Selden,* and *A. M. Ursich,* for respondent.

GERAGHTY, J.—Calvin Guthrie, Thomas Joyce and Martin Joyce were jointly charged, in an indictment returned by a grand jury impaneled in Pierce county, with the crime of grand larceny. A fourth defendant, Charles Owens, was named in the indictment, but was dismissed in the progress of the trial and testified as a witness for the state. The defendants seasonably interposed a motion to set aside the indictment and a plea in abatement, which were denied, as were a challenge to the sufficiency of the evidence and motions to dismiss and for a directed verdict at the close of the

case. The jury's verdict found the defendants guilty as charged, and after denial of motions in arrest of judgment and for new trial, judgment was entered and sentence imposed, from which the defendants appeal.

The indictment charges that the appellants, with intent to defraud Pierce county, obtained from the county "possession of and title to $244.50 in money of value of $244.50 in lawful money of the United States of America," by color and aid of false and fraudulent representations and pretenses and by trick, scheme, and device, in that Guthrie, being commissioner of Pierce county for district No. 3 and having supervision of Lake View Sanitorium, and Charles Owens, an employee of the county, under control of Guthrie, with Martin Joyce and Thomas Joyce, confederated and combined together with a unity of mind and common purpose and aim to defraud the county by furnishing to it certain services, labor and material in and about the repair of a boiler located in the sanitorium and charging the county $619.50 therefor, a sum grossly in excess of the fair and reasonable value thereof, and grossly in excess of a sum for which another person had offered to furnish the material and render the service; that the appellants well knew that the fair and reasonable market value of the services and materials was $375; that the appellants furnished the services, labor, and material for the repair of the boiler and thereafter presented and filed a verified claim and demand for payment under oath in the sum of $619.50, with the proper officers of the county; that the board of county commissioners of Pierce county, acting upon false and fraudulent representations made by the appellants that the claim was true and correct and that no public officer or employee of Pierce county had any personal interest therein, approved the claim; and the sum called for therein was thereafter duly paid to the

appellants; and that Guthrie, Owens, Martin and Thomas Joyce

" . . . did then and there wilfully, unlawfully and feloniously, aid, abet, counsel, hire, induce and encourage each other to do and commit said crime as herein alleged."

The appellant Guthrie became commissioner of Pierce county in January, 1933. In the division of the duties of the three county commissioners, he had the supervision of the sanitorium. Owens was stationary engineer at the Pierce county court house, under appointment of Guthrie, and for some time had charge of the boilers at the sanitorium.

During the period covered by the indictment, Martin Joyce was a policeman in the employ of the city of Tacoma. He was a stationary engineer by trade and had never done any contracting. The appellant Thomas Joyce, a brother of Martin, was engaged in the moving and storage business, as "Logan's Moving & Storage Company." He had never engaged in the contracting business, as the term is understood, nor done any brick work of the kind involved here.

During the spring or early summer of the year 1933, it was found that some repair work was required on one of the boilers at Lake View Sanitorium. Owens spoke of the prospective work to Tom Lillis, a bricklayer and expert boiler repairman, who had on former occasions done boiler repairing for Pierce county. After an examination of the boiler, Lillis estimated that the necessary repairs would cost $420, and gave Owens a written estimate containing a list of the repairs and the labor and material required. Some time later, Owens told Lillis that Commissioner Guthrie had authorized the repair of the boiler and had requested that one hundred dollars be added to the bill for himself, Guthrie. Lillis declined this proposal.

Later, Owens requested him to add an extra fifty dollars for his labor, saying that the rest would be added to the material bill. This proposal Lillis also declined, but offered to do the necessary labor on the job for $1.25 an hour for anyone who was given the work.

One Rendel, a salesman for George Schofield Company, dealing in construction material, gave Owens prices on the material required for the boiler job. He testified that Owens asked him if it would be possible to sell material at one price and bill the county at another. Rendel reported the suggestion to his company and was directed to advise that what Owens proposed could not be done. After this, Owens' connection with the sanitorium boilers was discontinued, although he remained engineer at the court house.

The boiler matter was left in charge of Mr. Peterson, the general business manager of the sanitorium. After Owens' direct connection with the sanitorium job had ceased, Rendel approached Peterson, then in charge, in an effort to sell the required material. He was informed by Peterson that the order had been given to one Horjes, of the American Plumbing & Steam Supply Company. Rendel then saw Horjes, who requested a profit of ten per cent to his company for running the order through its books. This, Rendel refused, for the reason that the American Plumbing & Steam Supply Company was not in the material business and, therefore, not entitled to it. After obtaining the list of required material made by Lillis and given to Owens, Rendel, for his company, submitted a bid to the American Plumbing & Steam Supply Company of $221.50, being Lillis' figures.

While the material was sold to the American Plumbing & Steam Supply Company, it was delivered by the Schofield Company direct to the sanitorium. The

American Plumbing & Steam Supply Company billed Logan's Moving & Storage Company for $293.65 for this material. Lillis, who had originally bid on the work, was employed by Martin Joyce, up to that time a stranger to him, to do the brick work. Joyce informed him that he had a job of repairing the sanitorium boiler and wished to employ him for the work. Lillis gave Joyce his labor prices: $1.25 an hour for himself and $.75 an hour for a helper. Joyce left the details of the job largely to Lillis, although he made short daily visits to the sanitorium.

Lillis testified that the reasonable value of the labor and material in the repair job, if done by the county, would be $375. He testified, however, that, if done by contract, with the cost of bond and other incidental expenses and a guarantee of the work for one year, coupled with the possibility that, as the work progressed, the necessity for additional repairs would develop, the figure of $619.50 would not be unreasonable; in fact, that a man would be a fool to make such a contract.

Owens testified that, in his judgment, the taking of a contract in the aggregate sum of $619.50 was reasonable and fair, especially where the contract provided for a guarantee of the work for one year, as the annual cost of keeping fire boxes in repair would average from $170 to $225.

Martin Joyce testified that he knew Owens, both of them being members of the engineer union; that, while at the union, Owens called his attention to the job and asked if he wanted to take the contract; that he later consulted his brother, Thomas Joyce, and asked him if he wanted to look at the job; that they went together to the sanitorium to inspect the boiler, but could not do so because there was fire in it. A few days later, he asked Owens for the plans and specifica-

tions. These were given to him and a blank form of contract. He estimated the various items of labor and material entering into the job, which included the figure of $293.75, paid to the American Plumbing & Steam Supply Company, for material. He gave these figures to his brother Thomas. To the figures he added twenty per cent for the contractor, the total being $619.50.

Thomas Joyce signed the contract. There being several copies, one was given to his brother and one to Peterson at the sanitorium. Joyce was told by Peterson to take his bid to the commissioners' office. This, he testified, he did, leaving it with the clerk of the commissioners to be signed by Guthrie. Later, the contract, signed by the commissioner, was returned to his brother. He was told by his brother that the contract had been signed and accepted and was asked to secure a good bricklayer. Owens had proposed Mr. Lillis. He inquired of others, who recommended Lillis, and then arranged to have Lillis do the work. He testified that Owens had not told him that he had asked Lillis to add one hundred dollars, or any other amount, on his part of the job.

Thomas Joyce testified to having made the written contract, introduced by the defendants in evidence, for the job; that the contract was made June 15, 1933. He had procured the form, with the details filled in, from his brother, Martin; that his brother then took the contract to the court house. Two or three weeks later, he received it back by mail from the office of the auditor; that it then had Mr. Guthrie's signature. He bought the material from the American Plumbing & Steam Supply Company because he had known them for years, and "at one time used to haul a lot of their stuff."

On August 10, 1933, the appellant Thomas Joyce

filed a claim with the county for $619.50 for various materials and labor used in making repairs to the sanitorium boiler. The appellants stipulated at the trial that this sum was paid by the county to Joyce. The claim was not filed as based upon a contract, but rather in the form of an open account for goods and services delivered. The contract alleged to have been executed was not filed until some time in October, 1934, a year after the completion of the work.

Of the numerous errors assigned, the first calling for consideration is the denial of appellants' motion to set aside the indictment and plea in abatement, based upon the grounds, (a) that the grand jury was not impaneled as required by law, but selected and chosen by the court; and (b) that the attendance of a special prosecutor upon the grand jury was unauthorized for the reason that the prosecuting attorney of Pierce county was not disqualified to act.

As the first step in the process of securing the grand jury, the names of fifty-one persons were drawn from the jury list and summoned to appear for duty. Of these, forty-three appeared. After examination collectively as to their general qualification, the names of the forty-three present were placed in the box. Then, as the names of the jurors were drawn from the box, the court examined them individually upon their qualifications. After seventeen persons had been thus examined and taken their places, the court, upon its own motion, excused four of them, and in the course of drawing additional names from the box to fill the vacancies, excused five others before the panel was completed and sworn. No objection is made to the manner in which the venire was drawn and summoned, nor to the qualification of the panel as finally constituted and sworn.

The contention made by appellants is that, after the

first seventeen names were drawn and passed for cause, the court was without power to excuse any of them upon his own motion and without the assignment of specific cause therefor. It is to be noted that the jurors were excused by the court before the complete panel of seventeen was formally constituted and sworn. The objection of the appellants is in effect that, as the examination of the prospective jurors on their *voir dire* showed they possessed the statutory qualifications, the court was without power, for reasons of its own, undisclosed, to excuse any of them from service on the panel.

In support of their objection, the appellants cite *State ex rel. Murphy v. Superior Court*, 82 Wash. 284, 144 Pac. 32. In that case, the grand jury was selected as follows: Seventy-eight names were drawn from the jury lists. Six were not found. A certain number claimed exemption under the statutes, so that about forty remained. From this number, the judge presiding selected seventeen to serve as grand jurors. Upon examination, some of these were found to be disqualified or were excused, whereupon the judge selected a sufficient number from those remaining on the panel to make up the required seventeen. This method of selection was condemned by this court, Judge Chadwick, speaking for the court, saying:

"It is provided in 3 Rem. & Bal. Code, § 94-4, that petit jurors shall be drawn by chance, 'and before the drawing is made the boxes shall be shaken up so that the slips bearing the names thereon may be thoroughly mixed, and the drawing of the slips shall depend purely upon chance.'

" 'Whenever the judge or judges of the superior court of any county in the state shall desire to summon a grand jury, the names of persons to serve as grand jurors shall be drawn from the jury list, as hereinbefore provided.' 3 Rem. & Bal. Code, § 94-5.

"That it was the policy of the legislature to preserve the right to have an unbiased and unprejudiced jury and grand jury, and that no suspicion should attach to the manner of its selection in all cases, cannot be questioned. An essential element in selecting jurors is the element of chance. The English speaking people have found no better way and have made it the supreme test of sufficiency. Selection by chance has been indorsed by this court, speaking in harmony with an unbroken current of authority. *Mercereau v. Maughlin Mill Co.,* 53 Wash. 475, 102 Pac. 232; *State v. Barnes,* 54 Wash. 493, 103 Pac. 792, 23 L. R. A. (N. S.) 932.

"In the *Mercereau* case, it was said:

" 'While the statute is not clear as to the exact method to be pursued, its purpose is to provide for chance drawing from the box.'

"The logic of this observation is that the court should not concern itself with methods, for there may be many methods adopted which would satisfy the law, but that it should insist that the jurors or grand jurors be selected by chance. In the case of *State v. Barnes,* the court quoted from the text of 24 Cyc. 218, wherein the general rule is laid down that methods may be directory, but the material thing, that the jurors should not be the product of arbitrary selection is so far mandatory as to give ground for challenge if it is not observed."

It will be noted that there was a vital difference between the manner in which the grand jury was selected in the *Murphy* case and the manner of its selection in the present case. There, the jurors impaneled were not drawn by chance from the box but were selected by the court, while here, the jurors impaneled were drawn, by the clerk, by chance from the box.

But the appellants urge that, if the process followed in this case is permitted, the court may, by indirection, through a process of elimination, accomplish the result condemned in the *Murphy* case; that, by excusing

all of the venire except seventeen, the court could determine the composition of the panel as effectively as if it had selected seventeen out of the venire in the first instance. But even in this extreme case, the final seventeen would not be of the court's choosing, because their presence on the panel would result from the chance drawing from the box of the other jurors.

The answer to appellants' contention is that the case they picture is not before us. Thirteen of the seventeen jurors first drawn by chance remained on the panel. The places of the four excused were filled by jurors whose names were drawn from the box, and there still remained in the box seventeen names of those summoned. If it be said that the court may not, upon its own motion, excuse as many as nine of the veniremen, how many may it excuse? Where shall the line be drawn? If the power to excuse one, in its sound discretion, be conceded to the court, why not the power to excuse nine? The rule deduced from the decisions is thus stated in 28 C. J. 794:

"Authority to discharge or excuse persons called to serve as grand jurors is sometimes expressly conferred by statute. Such statutes sometimes designate certain grounds as sufficient reason for excusal or discharge. While there is authority to the contrary, it is generally held that the discretionary power of a court to excuse or discharge persons called to serve as grand jurors for any reason it may deem sufficient is not restricted by a statutory specification of grounds of excusal or discharge."

Rem. Rev. Stat., § 2026 [P. C. § 9233], provides:

"Challenges to individual grand jurors may be made by such person for reason of want of qualifications to sit as such juror; and when, in the opinion of the court, a state of mind exists in the juror, such as would render him unable to act impartially and without prejudice."

While this section may be said to relate to challenges made by interested persons, it is not to be construed as denying to the court the right, upon its own motion, to excuse a juror deemed to be disqualified or incompetent. To deny this right would be out of harmony with the policy of the law, which charges the court with the responsibility of insuring that qualified and impartial grand jurors are secured.

"On the court is devolved the duty of ascertaining that each juror possesses the requisite qualifications, as a preliminary to giving in charge to the jury the duties they are required to perform. This duty the court uniformly observes, thereby guarding against the introduction of persons not fit or qualified to serve. Any person, as *amicus curiae,* can suggest the unfitness of any juror; and, if necessary, the court would hear evidence, and determine the question." *Boulo v. State,* 51 Ala. 18.

"The court has so long exercised the power of excusing jurors for reasons that have been deemed satisfactory, without its power so to do being questioned, that it must be regarded as firmly settled that the court has such power, and that the exercise of it in the discretion of the court will not ordinarily be revised." *State v. Bradford,* 57 N. H. 188, 198.

If a case should ever arise where this discretion is abused, this court will not hesitate to intervene; but we do not feel justified, from an apprehension of its abuse, in denying a power so essential to the court in the administration of criminal justice.

In *State ex rel. Murphy v. Superior Court, supra,* it is said:

"The manner of selecting grand jurors has been the occasion of some doubt, hence we feel warranted in saying that a grand jury might be selected in one of two very simple ways which are not inconsistent with the practice at common law and the usual statutory procedure. A certain number of names might be

drawn from the jury lists. The clerk might be directed to draw the names of individuals and qualify them singly until a sufficient number of jurors were obtained and these might be impaneled as grand jurors. Or, the judge might direct that all of those answering the summons of the court should be examined as to their qualifications and, out of the number so qualified, the clerk should draw by chance a sufficient number to make up the grand jury.''

But it does not follow from what was there said that any variation in detail from the course recommended would be fatal to the panel.

''The manner in which the jury panel shall be drawn is regulated in the different jurisdictions by statutory provisions, which are in most respects merely directory, but which as to their material provisions, designed for securing a fair and impartial jury, must be substantially complied with. . . . The most important requirement is that the panel shall be drawn and not arbitrarily selected, and any act of this character on the part of the clerk or other officers is ground for challenge to the array.'' 24 Cyc. 218, cited in *State v. Barnes*, 54 Wash. 493, 103 Pac. 792, 23 L. R. A. (N. S.) 932.

The second ground urged for quashing the indictment is the employment by the court of a special prosecutor for attendance upon the grand jury. The order appointing the special prosecutor recited that the grand jury had been called for investigating the conduct of all county officials of Pierce county; that the prosecuting attorney had requested the appointment of a special prosecutor, and that it appeared to the court that charges had been made against the prosecuting attorney and county commissioners; and that the prosecuting attorney deemed himself disqualified, and that it appeared to the court that he was disqualified from handling the investigation. Prior to this, the prosecuting attorney had addressed

a letter to the superior court judge in which he said that he was in accord with the suggestion "that a complete investigation be made, not only of all departments of government, but my office as well," and continued:

"Therefore, in order that there may be no interference from this office and me and that a complete investigation might be made, and for the public good, I request that you name a competent attorney to handle the investigation and the Grand Jury, whom I will be glad to appoint as a Deputy Prosecutor to act for that purpose."

And, accordingly, when the special prosecutor was appointed by the court, he was also designated by the prosecuting attorney as deputy prosecutor.

Rem. Rev. Stat., § 4135 [P. C. § 1794], provides:

"When any prosecuting attorney fails, from sickness or other cause, to attend a session of the superior court of the county for which he was elected or is unable to perform his duties at such session, the court or judge may appoint some qualified person to discharge the duties of such session, . . ."

In *State v. Wallace,* 119 Wash. 457, 206 Pac. 27, it is said:

"Without going further or discussing the authorities cited from other jurisdictions, we are of the opinion that there is ample authority vested in the superior court to appoint a special prosecutor in all proper cases, and that the exercise of that authority is not conditioned upon any recital in the order as to how, or from what source, he shall be compensated. Further, the act of 1893 expressly authorizes the appointment of any qualified attorney resident of the state in cases where there is no qualified person resident of the county who will consent to act, and such condition fairly appears from the recitals in the order appointing Mr. Holman; but even if these recitals were held to be insufficient, the superior court will be presumed to have acted within its authority until the contrary is

478

made to appear. Here there is no suggestion in the record that at the time in question there was any quali- fied person resident of Whatcom county who was will- ing or consented to perform the duties of the prose- cutor.''

While the immediate question involved there was the authority to appoint an attorney not a resident of Whatcom county, the opinion clearly indicates that the superior court will be conceded a large measure of discretion in determining whether the appointment of the special prosecutor is necessary. In the course of its opinion, the court used language which may be appropriately repeated here:

''A careful reading of the record, however, con- vinces us that the prosecuting attorney made clear to the trial court his position, which was, in effect, that he was disqualified as to the investigation of the charges affecting his own office, . . .''

The case of *State v. Heaton,* 21 Wash. 59, 56 Pac. 843, cited by appellants, is not in point. There, the grand jury made a return exonerating the prosecuting attorney, but suggested to the court that, because of certain prior actions taken by the prosecuting attor- ney, he would be so embarrassed that the aid of spe- cial counsel to the grand jury was rendered necessary. After this return of the grand jury was made, the prosecutor appeared in court and requested that he be permitted to advise the grand jury and comply with his duties as prosecuting attorney. Notwith- standing his presence in court and his readiness to perform the functions of his office, the trial court ac- ceded to the request of the grand jury and appointed a special prosecutor. This court held that the office of prosecuting attorney was quasi-judicial, and that, under the circumstances disclosed by the record in that case, the action of the court in supplanting him

by the appointment of a special prosecutor was unauthorized. In the present case, the prosecutor himself not only requested the appointment of a special prosecutor, but acquiesced in the court's action by designating its appointee as a special prosecutor.

We are of the opinion that the trial court did not err in denying the motion to set aside the indictment.

■ A witness, Stoddard, was permitted to testify, over the objection of the appellants, that, in January, 1933, while employed as a salesman by a meat company, and shortly after Guthrie's induction into office, he solicited the supplying of meat to the Lake View Sanitorium; that Guthrie told him he could have the meat business if he would pay seven hundred dollars for it, as he, Guthrie, was that much in the red. The reception of this testimony, tending to prove a separate and unrelated offense—the solicitation of a bribe —is assigned by the appellants as error highly prejudicial to them. The state contends the testimony was admissible as tending to prove intent.

The principle on which evidence of collateral crimes is excluded is well stated in *Coulston v. United States,* 51 F. (2d) 178:

"In the civil law, and very early in the common law, evidence of other crimes was admitted on the theory that a person who has committed one crime is apt to commit another. The inference is so slight, the unfairness to the defendant so manifest, the difficulty and delay attendant upon trying several cases at one time so great, and the confusion of the jury so likely, that for more than two hundred years it has been the rule that evidence of other crimes is not admissible."

To this general rule, there is the exception that, when intent is a necessary element of the crime, evidence of other crimes than the one upon which the accused is tried may be received as bearing upon that question. *State v. Harkness,* 136 Wash. 691, 241 Pac.

297; *State v. Clamp,* 164 Wash. 653, 3 P. (2d) 1096, 80 A. L. R. 1302; *State v. Schultz,* 168 Wash. 120, 10 P. (2d) 980; *State v. Linden,* 171 Wash. 92, 17 P. (2d) 635; *State v. Vogel,* 183 Wash. 664, 49 P. (2d) 473. The scope of this exception is limited by the necessity for the proof of intent. Where the acts charged as constituting the crime involved inherently the element of intent, proof of other crimes is not necessary and can have, as its effect, only the tendency to prejudice the accused in the eyes of the jury by showing that he is predisposed to crime.

Here, the appellants are charged with defrauding Pierce county by padding the cost of certain services and materials furnished. There can be no doubt of a criminal intent in such a case. If the acts are proven, the criminal intent necessarily inheres. In a discussion of this rule in *Fish v. United States,* 215 Fed. 544, 551, L. R. A. 1915A, 809, it is said:

"While there are exceptions to the general rule— that on the trial of a person for one crime evidence that he has been guilty of other crimes is irrelevant— it is not to be understood that any of the exceptions, when rightly applied, go to the extent of sanctioning the idea that a defendant's propensity to commit crime, or to commit crimes of the same sort as the one charged, can be put in evidence to prove him guilty of the particular offense; and that to come within the exceptions there must be some other real connection between the extraneous crime and the crime charged. As said by Judge Dixon in *State v. Raymond,* 53 N. J. Law, 265, 21 Atl. 330:

" 'However reasonable would be the deduction that, when a pocket is picked in a group of persons, of whom only one is addicted to picking pockets, he is the offender, his singularity in this respect could not, under our legal theory, figure as proof of his guilt. There must appear, between the extraneous crime offered in evidence and the crime of which the defendant is accused, some other real connection, beyond the allega-

tion that they have both sprung from the same vicious disposition.' ''

And in *Marshall v. United States,* 197 Fed. 511, a case frequently cited, the court says:

''In order to prove guilty intent the government introduced testimony showing defendant's connection with another similar scheme. The admission of such testimony is an exception to the general rule. It is allowed, where a guilty intent must be shown, to meet the presumption of accident or mistake. Such is the case of passing counterfeit money, or of filing under-valuing invoices 'with intent to evade' the customs law, or of making false representations 'with intent' to obtain property thereby. When the government has proved that the defendant has passed a counterfeit coin, or has filed an undervaluing invoice, or has made false representations, the case is not fully made out. Every one of these things might be done innocently in one instance, but hardly in many instances. The exception ought not to be extended. Such testimony certainly prejudices the defendant even if the court charges the jury that it is admitted only to show intent. It is not needed in the case of a scheme to defraud. It would be impossible to find the existence of a scheme to defraud without finding also the fraudulent intent of the person who devised it. The moment the fraudulent scheme is established, there is no necessity for resorting to other transactions as in the excepted cases mentioned. No one can have an innocent intent in devising a fraudulent scheme.''

The principle announced in the foregoing Federal cases is forcefully declared by our own court in *State v. Smith,* 103 Wash. 267, 174 Pac. 9:

''There is no more insidious and dangerous testimony than that which attempts to convict a defendant by producing evidence of crimes other than the one for which he is on trial, and such testimony should only be admitted when clearly necessary to establish the essential elements of the charge which is being

prosecuted. To establish guilty intent, unlawful motive, or criminal knowledge, it is permissible to show that the act charged against the defendant was one in a series of similar ones; but beyond this, the state cannot go and, for the purpose of securing a conviction, show the perpetration of other similar acts, even though committed in furtherance of a general scheme, where there is no proof required to establish intent, motive or knowledge, other than proof of the act charged itself. In other words, where the act charged against the defendant itself characterizes the offense, the guilty intent is proven by proving the act.''

It may be questioned, too, whether Stoddard's testimony was relevant as tending to prove intent. His testimony was that, some months before the transaction here involved, the defendant Guthrie solicited a bribe. In the present case, the appellants are charged with confederating together to cheat the county. Stoddard's testimony would, of course, tend to prove Guthrie a dishonest man and capable of committing the crime with which he was charged. But the collateral offense was not so related to the one for which the appellants were being tried as to make it relevant on the issue of intent.

The court charged the jury that the testimony of Stoddard was to be considered by them only for the purpose of proving intent. This admonition could not erase from the minds of the jury the impression made by the testimony and did not cure the error of its admission. *Boyd v. United States,* 142 U. S. 450, 12 S. Ct. 292; *Marshall v. United States,* 197 Fed. 511.

While Stoddard's testimony related to Guthrie, it could not help being prejudicial to the appellants Joyce as well. They were charged with having entered into a conspiracy with Guthrie to defraud the county. The court charged the jury that, if they found

that two or more of the defendants entered into a conspiracy, one of them received money, and none had withdrawn from the conspiracy, all were guilty, regardless of who received the money. It would be impossible for the jury to dissociate the Joyces from Guthrie, and any testimony prejudicial to him would of necessity prejudice them also. We are constrained to hold that the admission of Stoddard's testimony was prejudicial error affecting all the appellants.

■ The appellants assign as error the giving of several instructions by the court upon the law of conspiracy, claiming the instructions to be erroneous and tending to confuse the jury. Instruction No. 10 reads in part:

"The combination, or common design, or object, may be regarded as proved, if the jury believe, from the evidence, beyond a reasonable doubt, that the parties charged were actually pursuing, in concert, the unlawful objects stated in the indictment, whether acting separately or together, by common or different means; providing all were leading to the same unlawful result."

Here, there is implied the thought that the crime with which the defendants were charged could be regarded as proved if the jury believed from the evidence that the defendants had conspired together to commit it. The crime with which they were charged was not conspiracy, but grand larceny; and however criminal their design, they could be found guilty only if the grand larceny had been consummated. Of course, while conspiracy was not an included crime within the information charging grand larceny, nevertheless, as was said in *State v. McNeil,* 161 Wash. 221, 296 Pac. 555, evidence showing a conspiracy to commit grand larceny could be admitted as tending to establish the crime charged; but the conspiracy itself was not the crime charged. The will and design to de-

fraud the county, however criminal in themselves, did not constitute the crime. Proof of a conspiracy alone, without the commission of the overt act, would not sustain a conviction.

 Instruction No. 14 is as follows:

"The court instructs you that all who take part in a conspiracy, after it is formed and while it is in execution, and all who, with knowledge of the facts, concur in the plans originally formed, and aid in executing them, are fellow conspirators. They commit the offense when they become partners to the transaction or further the original plan."

Doubtless, the "offense" referred to in the last sentence of the instruction was intended by the court to refer to the conspiracy, but it would not necessarily be so understood by the jury, who might well infer that the "offense" was the one with which the defendants were charged in the indictment.

 In instruction No. 16, after some general observations, the court continued:

"And if you find from the evidence beyond a reasonable doubt that two or more of the defendants entered into a conspiracy to cheat, wrong and defraud, and steal the money of Pierce county, and that any one of them received money, the property of Pierce county, in excess of twenty-five dollars in furtherance of said conspiracy, and that none of them had withdrawn from the conspiracy, then in that event, each and all are guilty, regardless of who received the said money."

Four defendants were on trial, although one of them was later dismissed. The jury could have inferred from this instruction that, if two of the four had entered into a conspiracy to steal the money of Pierce county, and one of the conspirators did receive more than twenty-five dollars as a result, and none of them —inferentially referring to those who entered into

the conspiracy—had withdrawn, then all were guilty. This, of course, was incorrect, since only those who entered into the conspiracy were chargeable with what the conspirators did.

In considering these instructions, we do not lose sight of the fact that, in other instructions, the court properly informed the jury of the nature of the crime of grand larceny; but, conceding this, the overstressing of the conspiracy as a substantive crime, with the specifically erroneous instructions to which we have called attention, could not but becloud the issue and mislead the jury, to the prejudice of the appellants.

█ Finally, the appellants assign error upon the refusal of the trial court to grant their motion for a change of venue. In support of their motion, the appellants filed several affidavits tending to show the publication of numerous articles and statements prejudicial to them. These affidavits are contained in the statement of facts. The state also filed numerous controverting affidavits, not in the statement of facts, but brought here in a supplemental record. It is questionable whether these affidavits are properly before us, but, setting them aside, we do not feel warranted, upon the record as it otherwise stands, in overruling the conclusion of the trial judge on the motion. Referring to the provisions of the statute governing the question, we said in *State v. Welty,* 65 Wash. 244, 118 Pac. 9:

"It is apparent, from a reading of these sections, that the granting or denying of the change of venue is a matter resting entirely in the sound judicial discretion of the trial judge. Such being the statute, the ruling of the trial court cannot be reversed upon appeal, unless the record contains some evidence of its gross abuse, or it is shown that the court's ruling was arbitrary. Such has been our holding whenever such a question has been before us. *McAllister v.*

*Washington Territory,* 1 Wash. Terr. 360; *Edwards v. State,* 2 Wash. 291, 26 Pac. 258; *State v. Straub,* 16 Wash. 111, 47 Pac. 227; *State v. Champoux,* 33 Wash. 339, 74 Pac. 557. Such also is the general rule in construing statutes of like import. 12 Cyc. 243. The rule is not only based upon the statute, but is founded in reason."

There is here found no undue abuse of the broad discretion lodged in the trial court.

The judgment is reversed, and the cause remanded with direction to grant a new trial.

MAIN, MITCHELL, TOLMAN, HOLCOMB, BEALS, and BLAKE, JJ., concur.

STEINERT, J. (dissenting in part)—I agree with the majority that the judgment should be reversed, but I am of the opinion that, instead of directing a new trial, we should order the indictment quashed and the case dismissed, on the ground that the grand jury had not been impaneled as required by law.

The majority opinion apparently concedes that the element of chance is an essential in the selection of grand jurors, and that this element cannot be supplanted by the exercise of arbitrary choice on the part of the presiding judge. That is the rule emphatically laid down in *State ex rel. Murphy v. Superior Court,* 82 Wash. 284, 144 Pac. 32.

Recognizing the doubt that had previously existed concerning the manner of selecting grand jurors, and with the view of reducing the matter to one of certainty and thus affording a guidance to the judges of the superior court on future occasions, this court, in the *Murphy* case, indicated two very simple ways of making the selection, both of which are consistent with the practice at common law and the usual statutory procedure. In that case, the court said, on page 290:

"A certain number of names might be drawn from the jury lists. The clerk might be directed to draw the names of individuals and qualify them singly until a sufficient number of jurors were obtained and these might be impaneled as grand jurors. Or, the judge might direct that all of those answering the summons of the court should be examined as to their qualifications and, out of the number so qualified, the clerk should draw by chance a sufficient number to make up the grand jury."

Under the first method, the grand jurors would qualify *singly,* and when a sufficient number had so qualified, they would constitute the grand jury. Under the second method, *all* of the individuals answering the summons would first be examined as to their qualifications, and from those so qualified would be drawn, by chance, a sufficient number to make up the final body.

It is apparent that, under either method, the element of chance is fully preserved. According to the first, the chance is in the initial drawing followed by immediate qualification. According to the second, the chance is in the final drawing, after qualification of the entire number. But in either case, the panel would be complete, and the matter would be at an end when the required number of jurors found to be qualified had been drawn. There would then be no occasion or opportunity for leaving the panel open so as to permit of further or preferential selection from those remaining undrawn. If, as in this case, the court can first draw seventeen jurors, then excuse four on its own motion, drawing four others in their stead, and subsequently excuse five more, and in turn supply their places, then, manifestly, the court can by this method select any particular seventeen that it sees fit. All that the court would have to do would be to continue excusing and drawing until it had procured the

particular individuals that it had determined should serve. This is not chance; it is arbitrary choice, exercised by the court.

The court undoubtedly has the right to exercise its discretion in passing on the *qualifications* of the respective grand jurors, but it does not, in my opinion, have the right to select a particular group from a number who may be found to be qualified, nor to adopt any method which leads to that result.

I am certain that, in this case, the presiding judge had no other motive or desire than to procure a well-qualified jury, and I am satisfied that he pursued what he thought was a proper course. But I am equally satisfied that he was mistaken in his course and that the method taken by him was wrong, and I am unwilling to give sanction to it as a rule or guide in future cases.

It is not sufficient to say, as the majority opinion says, that, if a case should ever arise where the court has abused its discretion, this court will intervene. With such latitude of discretion as is conferred by the majority opinion, I doubt that occasion will ever arise where we can say that the court has abused its discretion. The method of selection has been plainly prescribed by the *Murphy* case, and we should insist that it be followed. If it is followed, then no just cause of complaint can arise, and no unmerited suspicion can ever attach. Since the method was not followed, I think that the indictment should be quashed and the case dismissed.

MILLARD, C. J. (dissenting in part)—I concur in the opinion of Steinert, J. Until *State ex rel. Murphy v. Superior Court*, 82 Wash. 284, 144 Pac. 32, is overruled, I am bound thereby. Under the rule announced in that case, we cannot, if consistent, do other than direct dismissal of the case at bar.