[Nos. 11067-2-III; 11114-8-III;   Division Three.   October 13, 1992.]
11099-1-III.

THE STATE OF WASHINGTON, *Respondent,* v. GLEN ALAN
LANGFORD, SR., *Appellant.*

THE STATE OF WASHINGTON, *Respondent,* v. SANTIAGO
R. SALINAS, *Appellant.*

THE STATE OF WASHINGTON, *Respondent,* v. PHILLIP D.
JORGENSEN, *Appellant.*

574

*Hugh M. Spall; Timothy M. Greene* and *Adame, Greene & Romero; John A. Moore* and *Moore & Thompson,* for appellants.

*Jeffrey C. Sullivan, Prosecuting Attorney,* and *John C. Monter, Deputy,* for respondent.

THOMPSON, A.C.J. — Glen Alan Langford, Sr., appeals his jury convictions for (1) second degree felony murder (accomplice); (2) first degree assault; (3) second degree assault; and (4) unlawful display of a weapon. Phillip Jorgensen and Santiago Salinas appeal their jury convictions for the lesser

included offense of second degree manslaughter.[1] They raise several issues, including whether the court erred in failing to instruct the jury that to convict them of second degree felony murder, it must find the victim was not a participant in the underlying felony. They also contend the court should have instructed the jury that the defendants, to be guilty as accomplices, had to intend to assist the principal in assaulting the victim with a knife. They rely upon evidence they only intended to assist the principal in engaging in a fistfight with the victim.[2] We affirm.

On April 11, 1990, Brook Simmons was accosted on three different occasions by Glen Langford, Jr., while driving his truck in a trailer court in Granger, Washington. Mr. Langford, Jr., ran at Mr. Simmons' vehicle, shouting angrily. Mr. Simmons testified he did not know why Mr. Langford, Jr., was upset, but Mark Elizondo testified he later heard that Mr. Langford, Jr., believed Mr. Elizondo had threatened to rape his sister. Mr. Elizondo was a friend of Mr. Simmons, and was riding in the truck with him at the time of the first contact with Mr. Langford, Jr.

Mr. Simmons was alarmed by Mr. Langford, Jr.'s conduct, and talked to his brother, Carson, about it. That afternoon, Carson Simmons, Conan Northwind, and some of their friends went to the trailer court to tell Mr. Langford, Jr., to leave Brook Simmons alone. They found Mr. Langford, Jr., repairing a motorcycle with Phillip Jorgensen and Mike Hummel. A fistfight between Carson Simmons and Mr. Langford, Jr., ensued, which Carson won. Mr. Langford, Jr., then picked up a gas can and hit Carson in the head with it. Carson threw Mr. Langford, Jr., down, and one of Carson's friends came over and kicked Mr. Langford, Jr., in the head.

---

[1] The three men were tried together, and this court consolidated their appeals.

[2] All three of the defendants join in these assignments of error. But because Mr. Salinas and Mr. Jorgensen were acquitted of second degree felony murder (accomplice) and convicted only of second degree manslaughter, they do not have standing to complain. We nevertheless address the arguments because they are necessary to disposition of Mr. Langford, Sr.'s appeal.

As Carson and his friends were leaving, Mr. Langford, Jr., told them, "Not only am I going to be after you; so is my Dad".

One of Carson's friends, Joseph Magana, testified he saw Mr. Langford, Sr., later that night when he went to make a call at the pay phone at the post office. Mr. Magana had worked for Mr. Langford, Sr., in the past. Mr. Langford, Sr., asked him to explain what had happened, then said: "I don't want no problems. . . . [B]ut if he wants problems, I have . . . older men, and there will be a killing."

Mike Hummel stated that the next day, April 12, he took his motorcycle to Mr. Langford, Jr.'s house so the two could work on it together. Shortly thereafter, Mr. Langford, Sr., Mr. Jorgensen, and Mr. Salinas arrived at the residence. The three older men had been drinking. Mr. Langford, Sr., began asking his son in a loud tone of voice whether he wanted to beat Carson's "ass". Mr. Langford, Jr., said, "yeah", and he and Mr. Hummel got into the back of his dad's truck. They went to a parking lot near Granger High School, where Carson was enrolled as a student.

Mr. Hummel testified he heard Mr. Langford, Sr., tell his son that "if he didn't beat Carson's ass he was going to beat his." He grabbed Mr. Langford, Jr., by the throat, instructing him how to fight Carson. Mr. Hummel saw Mr. Langford, Sr., give Mr. Langford, Jr., a knife, then take it back from him, stating he wanted his son to beat Carson with his hands. About 30 minutes before school got out, they moved to the school's parking lot. Mr. Langford, Sr., slashed a tire on Carson's vehicle with a knife. When Carson came out of the school, Mr. Langford, Sr., said: "Well, go get him; are you chicken?"

Mr. Northwind testified he met Carson at his locker after school that day. Carson knew that Mr. Langford, Jr., was in the parking lot. According to Mr. Northwind, Carson did not want to fight, but went outside anyway. Other witnesses described Mr. Langford, Jr., running toward Carson when he appeared, and Carson telling him, "come on". The two fought each other with their fists, and Mr. Langford, Sr., Mr. Jorgensen, and Mr. Salinas kept the other students out

of it. Witnesses testified Mr. Langford, Sr., had an open knife in his hand. As Carson was getting the better of him in the fight, Mr. Langford, Jr., reached into his back pocket, pulled out a knife, and stabbed Carson in the chest. Carson yelled, and Mr. Northwind stepped in and kicked the knife from Mr. Langford, Jr.'s hand. Mr. Langford, Sr., then stabbed Mr. Northwind in the chest. Ismael Cantu stated he heard Mr. Langford, Sr., tell his son to pull out his knife just before Carson was stabbed.

Carson Simmons died as a result of the stabbing. Mr. Langford, Jr., pleaded guilty to second degree murder. The State charged Mr. Langford, Sr., Mr. Jorgensen, and Mr. Salinas as accomplices to second degree felony murder. The jury convicted Mr. Langford, Sr., as an accomplice to second degree felony murder, and convicted Mr. Jorgensen and Mr. Salinas of the lesser included offense of second degree manslaughter. The State also charged Mr. Langford, Sr., with the first degree assault of Conan Northwind, and with two counts of second degree assault, based on his allegedly threatening Granger High School principal Ralph Hocking and teacher Dave Uggetti with a knife during the course of the fight. The jury convicted Mr. Langford, Sr., of first degree assault and of the second degree assault of Mr. Hocking. It convicted him of the lesser included offense of unlawful display of a weapon in connection with the charge relating to Mr. Uggetti.

First, the defendants contend the court erred when it (1) failed to instruct the jury it must find the victim was not a participant in the assault that caused his own death, and (2) instructed the jury it could convict if it found the defendants acted as accomplices to second degree assault, defined as an assault with a deadly weapon *or* an intentional assault which recklessly inflicts substantial bodily harm.[3] With

---

[3]The defendants assign error to the following instructions:

"INSTRUCTION NO. 6

"To convict a defendant of the crime of accomplice to murder in the second degree, each of the following elements of the crime must be proved beyond a reasonable doubt:

regard to the latter assignment of error, the defendants argue the court's instructions allowed the jury to convict if it found they intended to aid Mr. Langford, Jr., in engaging in a fistfight with Mr. Simmons, even if they did not know Mr. Langford, Jr., was armed with a knife.

---

"(1) That on or about the 12th day of April, 1990, Carson Simmons was killed;

"(2) That the defendant was acting as an accomplice to Glen Langford, Jr., who was committing or attempting to commit Second Degree Assault;

"(3) That Glen Langford, Jr. caused the death of Carson Simmons in the course of and in furtherance of such crime or in immediate flight from such crime;

"(4) That the acts which caused the death of the decedent occurred in Yakima County, Washington.

"INSTRUCTION NO. 20

"A person commits the crime of Second Degree Assault when he intentionally assaults another and thereby recklessly inflicts substantial bodily harm; or assaults another with a deadly weapon.

"INSTRUCTION NO. 21

" 'Substantial bodily harm' means bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or which causes a fracture of any bodily part."

The defendants also assign error to the court's refusal to give the following proposed instructions:

"INSTRUCTION NO. 6

"To convict a defendant of the crime of Accomplice to Murder in the second degree, each of the following elements of the crime must be proved beyond a reasonable doubt:

"(1) That on or about the 12th day of April, 1990, Glen Langford Jr. did stab at and into the person of Carson Simmons;

"(2) That Carson Simmons died as a result of the said acts of Glen Langford, Jr.;

"(3) That the acts occurred in Yakima County, Washington;

"(4) That the defendant was then and there acting as an accomplice to Glen Langford, Jr., and

"(5) That the defendant acted: either (a) with the intent to cause the death of Carson Simmons, or (b) with the knowledge that his action would promote or facilitate the commission or attempted commission of a felony assault which caused the death of Carson Simmons.

"PROPOSED INSTRUCTION 6

"A person can be an accomplice to a crime only if he acts with knowledge that his actions will promote or facilitate the crime charged. A person is not legally accountable for the conduct of another person if the principal or primary actor exceeds the scope of the preplanned illegality."

### A
### Victim's Participation in Underlying Felony

RCW 9A.32.050 provides:

(1) A person is guilty of murder in the second degree when:

. . . .

(b) He commits or attempts to commit any felony other than those enumerated in RCW 9A.32.030(1)(c), and, in the course of and in furtherance of such crime . . . he, or another participant, causes the death of a person *other than one of the participants* . . .[.]

(Italics ours.) According to the defendants, Carson was a participant in the fistfight at the school.

Nonparticipation is clearly an element of the crime of second degree felony murder.[4] However, in *State v. Brigham*, 52 Wn. App. 208, 209, 758 P.2d 559, *review denied*, 111 Wn.2d 1026 (1988), the court held that failure to include this element in the "to convict" instruction was harmless error. There, the victim and the defendant engaged in a fistfight. The victim was winning, until the defendant pulled out a knife and stabbed him to death. The court noted at page 210 that "[n]othing in the record indicates [the victim] helped to stab himself, or solicited, commanded, encouraged, or requested [the defendant] to do so. *See* RCW 9A.08.020(3)."

■ Likewise, Carson was not a participant in the stabbing here. Since it was the stabbing, not the fistfight, that caused Carson's death, it was not reversible error to omit the element of participation. In any event, we do not agree with the defendants that Carson was a participant in the fistfight. The testimony was that Mr. Langford, Jr., came to Carson's school looking for a fight, and Mr. Langford, Sr., slashed a tire on Carson's vehicle. Witnesses stated Mr.

---

[4]The trial court here *did* give instruction 5, based upon WPIC 27.03:

"A person commits the crime of murder in the second degree when he commits or attempts to commit Assault in the Second Degree and in the course of and in furtherance of such crime or in immediate flight from such crime he or another participant causes the death of a person *other than one of the participants* . . .". (Italics ours.)

Langford, Jr., "ran" at Carson when he saw him. Carson cannot be viewed as a participant within the meaning of the statute under these circumstances. The Legislature, in adding this element, prevented charges of felony murder in situations in which, for example, a coburglar is killed by a security guard. *See* W. LaFave & A. Scott, *Criminal Law* § 71, at 552 (1972). The term "participant" does not encompass a victim who was acting in self-defense.

## B
## Requisite Intent for Accomplice Liability

In *State v. Davis*, 101 Wn.2d 654, 658-59, 682 P.2d 883 (1984), the defendant was convicted as an accomplice to first degree robbery. He testified he was unaware his principal was armed until the principal produced the gun and demanded the money from the victim. The court held that the accomplice liability statute premised criminal liability on the accomplice's general knowledge he was assisting the principal in committing a crime, not upon his specific knowledge of the elements of the principal's crime. Thus, a person could be liable as an accomplice to first degree robbery even though he did not know his principal possessed a gun. As applied here, a person could be liable as an accomplice to second degree felony murder based on assault even though he did not know the means by which the principal intended to accomplish the assault.

The defendants attempt to distinguish *Davis* on the ground that the risk the victim will violently resist inheres in the crime of robbery; thus, they conclude, in a robbery situation, it is reasonable to hold an accomplice accountable for his principal's use of a weapon. But we are not persuaded that the risk of violence while assisting a principal in committing second degree assault is any less than in the robbery situation. The only way to distinguish *Davis* is by artificially limiting it to its facts. Such an approach would require us to ignore the Supreme Court's approval of *Davis* in *State v. Rice*, 102

Wn.2d 120, 683 P.2d 199 (1984), a felony murder case based on an assault.

The decisions relied upon by the defendants are not helpful. *State v. Diebold*, 152 Wash. 68, 72-73, 277 P. 394 (1929), and *State v. Dudrey*, 30 Wn. App. 447, 450, 635 P.2d 750 (1981), *review denied*, 96 Wn.2d 1026 (1982) cite the rule that to constitute felony murder, the homicide must occur within the res gestae of the intended crime. In *Diebold*, the court held the defendant was not guilty of felony murder when he hit and killed a young woman while returning an automobile he had stolen earlier. In *Dudrey*, the court upheld the defendant's conviction for felony murder based on facts showing he assisted in a burglary during which a codefendant killed a resident. Here, the jury found Mr. Langford, Sr., guilty of felony murder based on proof he assisted in an assault during which his son killed Carson Simmons. As in *Dudrey*, the homicide occurred within the res gestae of the underlying crime.

Consequently, we hold *Davis* applies to the facts here, and the trial court did not err in giving instructions based thereon.

█ Second, Mr. Jorgensen and Mr. Salinas contend Mr. Langford, Jr.'s assault on Carson Simmons merged with the homicide, thereby precluding the charge of felony murder. They argue this court should abandon the holding in *State v. Wanrow*, 91 Wn.2d 301, 588 P.2d 1320 (1978), which is contrary to their position. However, this court may not overrule decisions of our Supreme Court. *See Hamilton v. Department of Labor & Indus.*, 111 Wn.2d 569, 571, 761 P.2d 618 (1988); *State v. Gore*, 101 Wn.2d 481, 487, 681 P.2d 227, 39 A.L.R.4th 975 (1984). We therefore reject this argument.[5]

Third, Mr. Langford, Sr., and Mr. Jorgensen assert the jury selection process violated the state and federal consti-

---

[5]In addition, as noted above, Mr. Jorgensen and Mr. Salinas were acquitted of felony murder and have no standing to raise this issue.

tutions because: (1) potential jurors in certain occupational groups were excused automatically by the clerk if they so requested; and (2) the *clerk* excused the jurors, rather than the *court* as required by RCW 2.36.100.[6]

Prior to jury voir dire, the defendants challenged the entire jury panel, based upon the testimony of Jennifer Cramer, assistant county clerk. Ms. Cramer testified the panel was randomly selected by computer. Of the 601 persons sent summonses for jury duty in July, 82 did not respond. Some of those sent summonses called the County with excuses, and those calls were directed to Ms. Cramer. Utilizing guidelines developed by the Superior Court and set forth in a 1986 memorandum from Judge Cameron Hopkins, she excused certain people from jury duty. Health care providers received automatic exemptions. The guidelines also specified "[k]ey personnel, i.e., indispensable to the operation of a business" could be excused. Thus, if teachers asked for an excuse during the school year, Ms. Cramer automatically granted it. This practice resulted in only 10 teachers actually reporting as prospective jurors in March and April of 1990, while 20 reported for the July trial calendar. The defendants were tried in July.

■ Royce Ferguson, in his treatise *Criminal Practice and Procedure*, states:

> The only right the criminal defendant has is that the selection process which produced the jury "did not operate to systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *The point at which to consider the constitutionality of the selection process is at the selection of the master list from which the panel of each jury term is selected.*

(Footnote omitted. Italics ours.) 13 R. Ferguson, Wash. Prac., *Criminal Practice and Procedure* § 3504, at 316-17 (1984) (quoting *Taylor v. Louisiana*, 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692 (1975)).

---

[6]They also complain the court did not follow up on summonses which were neither returned by prospective jurors nor returned by the post office as undeliverable. But they do not show that this practice resulted in the exclusion of any particular class of juror or otherwise prejudiced them. We therefore do not consider this argument.

Ms. Cramer testified the jury master list was selected at random. The case which the defendants rely upon, *Thiel v. Southern Pac. Co.*, 328 U.S. 217, 90 L. Ed. 1181, 66 S. Ct. 984, 166 A.L.R. 1412 (1946), involved a situation in which daily wage earners were excluded from the *master* jury list because the court clerk had predetermined that such people would suffer a financial loss by serving on a jury and therefore would likely request an excuse from such service. Here, health care providers and teachers were included in the master list; they had to affirmatively call and request an exemption if they did not want to serve as a juror. The process used in selecting jurors for the master list was constitutional.

■ The next question is whether procedures utilized *after* selection of the jury master list amounted to an abuse of discretion by the trial court *and* adversely affected the defendants. In *State v. Killen*, 39 Wn. App. 416, 693 P.2d 731 (1985), a defendant challenged the trial court's releasing three veniremen from jury duty who claimed to have scheduling conflicts with the trial. *Killen* stated at pages 418-19:

> [S]tatutory and common law authorize[s] the court to excuse veniremen on its own motion. "To deny this right would be out of harmony with the policy of the law, which charges the court with the responsibility of insuring that qualified and impartial grand jurors are secured." *State v. Guthrie*, [185 Wash. 464, 475, 56 P.2d 160 (1936)]. Review [is] based on the abuse of discretion standard . . ..
>
> RCW 2.36.100 provides the trial court may excuse the veniremen "upon a showing of undue hardship, extreme inconvenience, . . . or any reason deemed sufficient by the court . . ." An earlier version of the statute . . . was held to vest wide discretion in the trial court.
>
> In *State v. Phillips*, 65 Wash. 324, 118 P. 43 (1911), doubt was raised about a venireman's citizenship. The trial court excused him without proof he was not a United States citizen. The Supreme Court affirmed, holding the fact a venireman may have been rejected on insufficient grounds is of no consequence *unless as a result an unqualified juror is selected.*

(Citation omitted. Italics ours.) The court found no abuse of discretion under the facts there. *Killen*, at 419.

Contrast *State v. Tingdale*, 117 Wn.2d 595, 817 P.2d 850 (1991) in which, under the County's procedure, potential jurors were not called if the clerk believed, based upon personal knowledge, the juror was acquainted with the defendant and would be either excused for cause or by use of a peremptory challenge during voir dire. *Tingdale*, at 599. *Tingdale* held the trial judge's use of this procedure constituted an abuse of discretion, and prejudice was presumed because it represented a material departure from the statutes. *Tingdale*, at 599-600. The court reasoned at pages 602-03:

> As a result of the trial court's rejection of these jurors, qualified jurors were rejected, and petitioner was forced to accept other, possibly "unqualified", jurors (namely, the friend of the sheriff). Had there been persons acquainted with both parties on the panel, perhaps a more "balanced" (impartial) jury would have resulted.

(Footnote omitted.)

Here, Ms. Cramer utilized guidelines prepared by the Superior Court in deciding whether to excuse prospective jurors. She was not acting on her own; rather, she acted as the court's agent and within its guidelines. The guidelines were consistent with RCW 2.36.100, which authorizes the court to excuse persons from jury service "upon a showing of undue hardship, extreme inconvenience . . . or any reason deemed sufficient by the court . . .". Since the jurors excused for occupational reasons were excused for reasons within the statute, the court did not abuse its discretion. Also, any potential problem with excusing teachers during the school year did not affect these defendants, who were tried during the summer.[7]

---

[7]*State v. Rice*, Supreme Court cause 56932-1, currently pending, presents issues arising out of the jury selection process utilized in Yakima County. The briefs in *Rice* indicate the clerk there did not exercise discretion, but, instead, granted exemptions to *all* jurors who so requested. Here, Ms. Cramer testified she utilized the Superior Court's guidelines. Because of this distinction, there is no reason to stay our decision pending the Supreme Court's issuance of *Rice*.

Fourth, the defendants assign error to the trial court's denial of the motion for change of venue due to pretrial publicity.

■■■ The Supreme Court has summarized the law governing motions for change of venue:

> A motion for a change of venue in a criminal case is directed to the sound discretion of the trial court. *State v. Stiltner*, 80 Wn.2d 47, 52, 491 P.2d 1043 (1971). The trial court's decision regarding a change of venue motion will not be disturbed on appeal "absent a convincing showing of an abuse of discretion." *State v. Stiltner*, 80 Wn.2d at 52. . . .
>
> While defendant's due process rights are not violated merely by the existence of pretrial publicity, they are violated where pretrial publicity prejudices the defendant's right to an impartial jury. The defendant need not affirmatively show actual prejudice resulting from pretrial publicity. A motion for change of venue must be granted where defendants show an apparent probability of prejudice to their right to an impartial jury.
>
> In ruling on a motion for change of venue because of pretrial publicity, the trial court should consider the following factors:
>
> > (1) the inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn.
>
> *State v. Crudup*, 11 Wn. App. 583, 587, 524 P.2d 479, *review denied*, 84 Wn.2d 1012 (1974).

(Citations omitted.) *State v. Laureano*, 101 Wn.2d 745, 756-57, 682 P.2d 889 (1984), *overruled on other grounds in State v. Brown*, 111 Wn.2d 124, 132-33, 761 P.2d 588 (1988). *See also State v. Hoffman*, 116 Wn.2d 51, 72, 804 P.2d 577 (1991).

Applying the above criteria to the facts of this case, we observe as follows. (1) Portions of the publicity were inflammatory. In particular, the newspaper reported Mr. Langford, Sr., had a prior criminal record, had long bullied his son,

and had goaded him into the fight with Mr. Simmons. (2) The publicity was disseminated in the only newspaper of general circulation in the county and over the local television stations. (3) However, the coverage cited by the defendants ended approximately 2 months before trial started; only one television newscast occurred after mid-May. (4) Before voir dire, the court excused all jurors who stated in a questionnaire they had formed an opinion about the case. The remaining jurors who remembered reading about the case either could not recall details or affirmatively stated their belief that news accounts are often inaccurate and that the verdict should be based upon the evidence produced at trial. (6) The court freely granted challenges for cause. (7) While the defendants suggest the newspaper got its information about Mr. Langford, Sr.'s prior conviction from law enforcement officials, the record does not support this assertion. (8) and (9) Finally, although the charges against the defendants were serious, the venire was drawn from a fairly large population base. Yakima County has 73,000 registered voters.

In summary, the above factors do not show an apparent probability of prejudice to the defendants' right to an impartial jury. The trial court did not abuse its discretion in denying the motion for change of venue.

Fifth, Mr. Jorgensen and Mr. Salinas contend cumulative error affected their verdicts. While accumulated error may be the basis for a new trial even though the error, when viewed singly, is harmless, *see State v. Coe*, 101 Wn.2d 772, 789, 684 P.2d 668 (1984), our analysis of the preceding issues concludes Mr. Jorgensen's and Mr. Salinas's assignments of error are not well taken. There was no accumulated error.

Sixth, Mr. Langford, Sr., challenges the instructions relating to his alleged first degree assault of Conan Northwind. Instruction 17 reads: "A person commits the crime of assault in the first degree when he, with intent to inflict great bodily harm, assaults another with a deadly weapon or by any means likely to produce great bodily harm or death." Instruction 19 defines "great bodily harm" as "bodily

injury which creates a probability of death." Instruction 17 is modeled after RCW 9A.36.011(1)(a), and instruction 19 is modeled after RCW 9A.04.110(4)(c). According to Mr. Langford, Sr., "probability of death" is a standard which permits juries to convict based on arbitrary reasons. He argues every assault, including a punch in the nose, carries a probability of death.

█ To comport with due process, statutes must contain adequate standards to prevent arbitrary enforcement. *State v. Maciolek*, 101 Wn.2d 259, 264, 676 P.2d 996 (1984). Even if a statute is "potentially vague as to some conduct, [it] may nevertheless be constitutionally applied to one whose act clearly falls within the statute's 'hard core.' " *Maciolek*, at 266 (quoting *Bellevue v. Miller*, 85 Wn.2d 539, 541, 536 P.2d 603 (1975)). Mr. Langford, Sr.'s conduct here in stabbing Mr. Northwind in the chest clearly falls within the statutory standard of conduct "likely to produce great bodily harm or death". RCW 9A.36.011(1)(a). *See also* RCW 9A.04-.110(4)(c). The statutory standard, which was incorporated in the jury instructions, is constitutional as applied to the facts of this case.

Seventh, Mr. Langford, Sr., maintains the court improperly ordered his sentence for his misdemeanor conviction to run consecutively to his sentences for his felony convictions, without finding reasons justifying an exceptional sentence. He relies upon RCW 9.94A.400(1), which provides:

> (a) . . . [W]henever a person is to be sentenced for two or more current offenses, the sentence range for each current offense shall be determined by using all other current and prior convictions as if they were prior convictions for the purpose of the offender score: . . . Sentences imposed under this subsection shall be served concurrently. *Consecutive sentences may only be imposed under the exceptional sentence provisions of RCW 9.94A.120 and RCW 9.94A.390(2)(f) or any other provision of RCW 9.94A.390.*

(Italics ours.)

█ However, since the Sentencing Reform Act of 1981 applies to felony sentences only, *see* RCW 9.94A.010, the above statute does not limit the discretion of the judge in

imposing a sentence on a misdemeanor conviction. *See In re Schaupp*, 66 Wn. App. 45, 831 P.2d 156 (1992) (citing *State v. Tu Nam Song*, 50 Wn. App. 325, 748 P.2d 273 (1988)). Thus, the court did not need to find reasons justifying an exceptional sentence to impose the consecutive sentences.

█ Eighth, Mr. Langford, Sr., contends the court erred in ordering various financial assessments. He asserts he lacks the ability to pay. The Supreme Court has recently held that such statutory assessments are constitutional because they contain adequate safeguards to protect indigent defendants from imprisonment for failure to pay. *State v. Curry*, 118 Wn.2d 911, 829 P.2d 166 (1992). If Mr. Langford, Sr., cannot pay the assessments, his remedy is to request a hearing.

Finally, we have reviewed Mr. Langford, Sr.'s pro se brief and have addressed his arguments in our analysis of the above issues.

Affirmed.

MUNSON and SWEENEY, JJ., concur.

Review denied at 121 Wn.2d 1007 (1993).