# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 46687-2-II |
| Respondent, | |
| v. | |
| DARRELL PARNEL BERRIAN, | UNPUBLISHED OPINION |
| Appellant. | |

SUTTON, J. — Darrell Parnel Berrian appeals his conviction and sentence for first degree assault with a deadly weapon and the deadly weapon sentence enhancement. Berrian argues that the State failed to present sufficient evidence of intent to cause great bodily harm and that he was armed with and assaulted Tavaris Morriel with a deadly weapon. In his statement of additional grounds (SAG), Berrian also argues that (1) the trial court improperly admitted the photomontage from which Morriel identified Berrian as his assailant, (2) the trial court impermissibly closed the court room when it answered a jury question, (3) the State was relieved of its burden of proof because the jury instructions were improper, and (4) his trial counsel was ineffective for failing to propose a self-defense jury instruction.

We hold that the State presented sufficient evidence of intent to cause great bodily harm, Berrian was armed with a deadly weapon, the trial court did not err in admitting the photomontage, the trial court did not close the court room when it answered the jury's question, the trial court's jury instructions were not improper, and Berrian received effective assistance of counsel. Therefore, we affirm his conviction and deadly weapon sentence enhancement.

FACTS

I. STABBING INCIDENT

On the evening of November 12, 2012, Morriel was spending time with two of his friends. The three were drinking alcohol, and at midnight they walked down the street from the apartment complex they were in to a gas station to purchase more beer. While he was inside the store, Morriel saw a store employee arguing with two black men in the parking lot. Morriel went outside "to calm the situation down" by talking to them. 3 Verbatim Report of Proceedings (VRP) at 76. When he approached and told the two men to "chill out," one of the men, whose hair was in long dreadlocks, swung at Morriel, and the two began fighting. 3 VRP at 76.

Morriel estimated that they fought in the parking lot for five to ten minutes and ended up on the ground. Eventually, the men were separated. Morriel watched the two men walk down the street; then, he began to walk across the street in the other direction with his two friends, and soon after one of his friends told him that someone was running toward them. Morriel turned around, and the man with dreadlocks who he had been fighting with stabbed Morriel in his torso, close to his left breast, with a small knife that had a two inch blade. Once he realized what had happened, Morriel walked across the street from the gas station to his girlfriend's apartment, where he was contacted by the police and medical aid personnel.

Morriel was transported to the emergency room, where he was treated by a trauma surgeon. According to the trauma surgeon, the location of Morriel's wound, near the diaphragm, was "concerning" and that it is possible to have a wound to the chest which penetrates "all the way into the abdomen." 2 VRP at 75. The trauma surgeon performed a laparoscopic procedure on Morriel to ensure that the knife had not done so. Also, a stabbing injury like Morriel's could have

punctured a lung. Morriel experienced immediate "bleeding around the lung," which meant that the knife penetrated deep enough to cause muscular bleeding in the chest cavity. 2 VRP at 77.

Morriel continued to have difficulty breathing after he was released from the hospital. Morriel sought medical treatment again, and doctors discovered blood accumulation around Morriel's lung. Morriel then underwent surgery to remove a clot that had formed in his wound. If Morriel had not received treatment when he did, the blood clot would have been life threatening. About eight months after the stabbing, he had a small scar and numbness where he was stabbed, had a longer scar from the surgery, and he still could not breathe normally or "take deep breaths." 3 VRP at 93-94.

II. PHOTOMONTAGES[1]

Because Morriel could not give law enforcement more than a general description of his assailant, no detective was immediately assigned to investigate the case. In August 2013, however, an inmate at Pierce County jail sent information to the Lakewood Police Department that another inmate had told him he stabbed someone the previous fall in the neighborhood where the gas station is located. Detective Jeff Martin investigated the tip.

Martin received the name of the informant, but he did not immediately speak with that person because he wanted to independently verify the information. The informant had provided a description of the suspect who had committed the stabbing and specified that it was someone

---

[1] The trial court did not conduct an evidentiary hearing on this issue. At trial, the jury heard testimony from the Pierce County jail informant, Morriel, and Jeff Martin, the detective who created the two photomontages and who testified at length about the process of creating and presenting the montages to Morriel.

within his unit in the jail, so Martin searched through the inmates that were currently housed in that particular jail unit. Based on the description the informant provided, Martin narrowed down the possible suspects to a single person. This person was not Berrian.

After he identified a possible suspect, Martin created a photomontage that included the suspect he had narrowed down to but did not include Berrian. The montage included the suspect's booking photo with five additional booking photos of black males that looked similar to the suspect. This montage was on a single sheet of paper. Martin informed Morriel that officers "may have had a break in the case," and he and another officer met with Morriel on August 7 to present him with the montage. 4 VRP at 22. Before Morriel looked at the montage, he read and signed an admonishment that told him not to guess in his choice and that the photos should not influence his judgment. Morriel selected the person who Martin had earlier identified as the suspect,[2] but stated that he was only "60 percent" certain that the person he chose was his assailant. 4 VRP at 26.

The next day, Martin contacted the jail informant. During that interview, the informant told Martin that his cellmate, Berrian, was the person who said he had stabbed a person at a gas station the previous fall. Berrian told the informant that after the incident he had shaved off his dreadlocks to "disguise himself." 2 VRP at 169.

With this new information, Martin created a second photomontage that included Berrian's photograph with the only photograph that Martin could obtain at the time. Martin obtained this photograph from Pierce County jail, and Berrian did not have dreadlocks in the photo. In this

---

[2] This person was not Berrian.

montage, eight different photos were on separate pages. Berrian's photograph was photo number seven. Martin created the second montage different from the first photomontage because the only photo of Berrian available to Martin at the time was "slightly unique compared to -- typical photographs." 4 VRP at 29. Martin chose the photos for the second montage based on different aspects of their similarity to Berrian's photo, such as two individuals with their mouths open and two in gray clothing. All of the photos were of black males in jail uniforms.

When Martin contacted Morriel again to look at the second montage, Martin told Morriel that he "might have been right about being wrong" about his first choice. 3 VRP at 130. Before looking at the photos, Morriel again read and signed an admonishment identical to the first admonishment. Martin asked the officer who accompanied him, who had no knowledge of the investigation, to show the photos to Morriel so as to alleviate any suggestiveness that Martin may have conveyed. Morriel had an emotional reaction when he turned the page to Berrian's photograph and immediately identified Berrian as his assailant. At trial, Morriel again identified Berrian as the man who stabbed him.

III. PROCEDURE

The State charged Berrian with one count of first degree assault while armed with a deadly weapon.

A. CrR 3.6 MOTION TO SUPPRESS PHOTOMONTAGES & MOTION TO DISMISS

Berrian moved to suppress evidence of the two photomontages and Morriel's identification of him using the photomontages. At the CrR 3.6 hearing, defense counsel waived an evidentiary hearing on the photomontage issue because the surrounding facts were undisputed. The trial court found that because the parties' pleadings sufficiently described the circumstances of the montages and the key facts were largely undisputed, testimony was unnecessary and would not "appreciably add to the Court's understanding." Clerk's Papers (CP) at 85.

Before counsel provided oral argument on the suppression motion, the trial court noted that he had read the parties' briefs on the motion and asked counsel to focus on the suggestiveness of the photomontages. Following argument, the trial court denied Berrian's motion to suppress the photomontages because the second montage was not overly suggestive.

The trial court reasoned that the second photomontage and Berrian's photo in it was not "alarmingly unusual" because all of the men were black males who "generally resemble [Berrian]." CP at 85, 86. The trial court explained that Martin's comment about Morriel's uncertainty in his choice from the first photomontage "did not suggest to Mr. Morriel that he should choose anyone from among the eight photographs." CP at 87.

After the State rested its case, Berrian moved to dismiss the charge. Berrian argued that the State had not presented sufficient evidence of his intent to cause Morriel great bodily harm or that he was armed with a knife that had a blade three inches or longer. The trial court denied Berrian's motion.

B. JURY INSTRUCTIONS, QUESTION & VERDICT

The State proposed jury instructions and, before the trial court ruled on its specific instructions, defense counsel indicated that he had no objections to the State's proposed instructions. The trial court's to-convict instruction on first degree assault provided as follows:

> To convict the defendant of the crime of assault in the first degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about November 13, 2012, the defendant assaulted Tavaris Morriel;
> (2) That the assault was committed with a deadly weapon or by a force or means likely to produce great bodily harm or death;
> (3) That the defendant acted with intent to inflict great bodily harm; and
> (4) That this act occurred in the State of Washington.

CP at 152. The trial court instructed the jury that "[g]reat bodily harm means bodily injury that creates a probability of death, or that causes significant serious permanent disfigurement, or that causes a significant permanent loss or impairment of the function of any bodily part or organ." CP at 154.

As to the State's charge of a deadly weapon sentencing enhancement, the trial court instructed the jury that a deadly weapon is "any weapon, device, or instrument, which under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm." CP at 156. The trial court further instructed the jury that substantial bodily harm is "bodily injury that involves a temporary but substantial disfigurement, or that causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or that causes a fracture of any bodily part." CP at 157.

During deliberations, the jury sent the trial court a question, but the parties did not designate the question in the Clerk's Papers on appeal, and the trial court did not read the question into the record. However, the trial court opened its discussion of the jury question by asking counsel if

both of them had had a chance to review it. Defense counsel responded, "Yes, Your Honor." 4 VRP at 125. The parties and the trial court then discussed how to answer the question, and the trial court ruled that it would answer as defense counsel had requested.

The jury found Berrian guilty of first degree assault and found by a special verdict that he was armed with a deadly weapon at the time of the assault. Berrian appeals.

## ANALYSIS

Berrian raises two issues on appeal. First, he argues that the State failed to prove every element of first degree assault because it did not present sufficient evidence of intent to inflict great bodily harm. Second, Berrian argues that the State also failed to present sufficient evidence that Berrian assaulted Morriel with a deadly weapon, an element of first degree assault, or that he was armed with a deadly weapon, a requirement of the sentencing enhancement. We disagree.

I. STANDARD OF REVIEW ON SUFFICIENCY OF THE EVIDENCE

Due process requires the State to prove every element of the charged crime beyond a reasonable doubt. *State v. Kalebaugh*, 183 Wn.2d 578, 584, 355 P.3d 253, 256 (2015). To determine if the State presented sufficient evidence, we view the evidence in the light most favorable to the prosecution and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Condon*, 182 Wn.2d 307, 314, 343 P.3d 357 (2015). An appellant's claim of insufficient evidence admits the truth of the State's evidence and "'all inferences that reasonably can be drawn [from it].'" *Condon*, 182 Wn.2d at 314 (alteration in original) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)).

II. INTENT TO INFLICT GREAT BODILY HARM

Berrian argues that the State presented insufficient evidence for the jury to find that he acted with intent to inflict great bodily harm because the knife he used was two inches, the knife wound did not impact any of Morriel's vital organs, the injury caused "only some internal bleeding," and the wound left a small scar. Br. of Appellant at 11. We disagree.

The State charged Berrian with first degree assault under RCW 9A.36.011(1)(a). That statute provides that a person commits first degree assault "if he or she, with intent to inflict great bodily harm . . . [a]ssaults another." RCW 9A.36.011(1)(a). Great bodily harm is "bodily injury which creates a probability of death, or which causes significant serious permanent disfigurement, or which causes a significant permanent loss or impairment of the function of any bodily part or organ." RCW 9A.04.110(4)(c).

To find Berrian guilty of first degree assault, the jury was required to find beyond a reasonable doubt that Berrian, when he stabbed Morriel, "acted with intent to inflict great bodily harm." CP at 152. The trial court's jury instructions defined great bodily harm as "injury that creates a probability of death . . . or that causes . . . impairment of the function of any bodily part or organ." CP at 154.

A person acts with intent "when he or she acts with the objective or purpose to accomplish a result which constitutes a crime." RCW 9A.08.010. First degree assault requires proof of specific intent, which is intent to produce a specific result. *State v. Elmi*, 166 Wn.2d 209, 215, 207 P.3d 439 (2009). Evidence of intent "'is to be gathered from all of the circumstances of the case, including not only the manner and act of inflicting the wound, but also the nature of the prior relationship and any previous threats.'" *State v. Wilson*, 125 Wn.2d 212, 217, 883 P.2d 320 (1994)

(internal quotation marks omitted) (quoting *State v. Ferreira*, 69 Wn. App. 465, 468, 850 P.2d 541 (1993)). Specific intent may not be presumed, but we may infer it "as a logical probability from all the facts and circumstances." *Wilson*, 125 Wn.2d at 217.

We have previously held that stabbing a person in the chest falls within the statutory standard of great bodily harm. *State v. Langford*, 67 Wn. App. 572, 587, 837 P.2d 1037 (1992), *review denied*, 121 Wn.2d 1007 (1993), *cert. denied*, 510 U.S. 838 (1993). We have also previously held that a rational jury could find that the defendant acted with intent to cause great bodily harm when he stabbed several people "in the back, chest[,] or stomach" and one person needed several surgeries to repair the damage. *State v. Huddleston*, 80 Wn. App. 916, 922, 912 P.2d 1068 (1996).

The State's evidence at trial was sufficient for a rational jury to find that Berrian acted with intent to inflict great bodily harm when he stabbed Morriel. After fighting in the gas station parking lot, Morriel and Berrian left the area in opposite directions. As Morriel and his friends walked away, however, Berrian ran back to him and stabbed Morriel. It is undisputed that Berrian stabbed Morriel in his chest, near his left breast and the area of his diaphragm and his lungs. If Morriel had not undergone surgery for the blood clot that formed around his lung after his initial treatment, the injury inflicted by Berrian would have threatened Morriel's life. Morriel was unable to take deep breaths even after healing from the surgery. Viewed in the light most favorable to the State, it can be inferred "as a logical probability" from these facts and circumstances that Berrian acted with specific intent to inflict great bodily harm. *Wilson*, 125 Wn.2d at 217.

III. ARMED AND ASSAULTED VICTIM WITH A DEADLY WEAPON

Berrian also argues that the State presented insufficient evidence that he was armed with a deadly weapon and assaulted Morriel with that deadly weapon. We disagree.

The crime of first degree assault, as charged by the State, requires proof that Berrian assaulted Morriel with a deadly weapon. RCW 9A.36.011(1)(a). A deadly weapon under the crime of first degree assault is a weapon "which, under the circumstances in which it is used . . . is readily capable of causing death or substantial bodily harm." RCW 9A.04.110(6).

The State's information further charged that Berrian's sentence should be enhanced because he was armed with a knife, "a deadly weapon," when he assaulted Morriel.[3] CP at 1-2. To enhance a defendant's sentence following a guilty verdict, the jury must find that the defendant used "an implement or instrument which has the capacity to inflict death and from the manner in which it is used, is likely to produce or may easily and readily produce death." RCW 9.94A.825.

The trial court instructed the jury that a deadly weapon is a weapon which, "under the circumstances in which it is used . . . is readily capable of causing death or substantial bodily harm." CP at 156. Substantial bodily harm is "bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ." RCW 9A.04.110(4)(b). The trial court's jury instruction defining substantial bodily harm was identical to this statute.

A knife that has a blade longer than three inches is per se a deadly weapon. RCW 9.94A.825. It is a question of fact for the jury, however, whether a knife that has a blade

_____

[3] RCW 9.94A.530 provides that the trial court may sentence a person to serve additional time on a standard range sentence if the jury finds that the defendant was armed with a deadly weapon.

11

shorter than three inches is a deadly weapon. *State v. Cobb*, 22 Wn. App. 221, 223, 589 P.2d 297 (1978). "The test is not the extent of the wounds actually inflicted." *Cobb*, 22 Wn. App. at 223. "Rather, the test is whether the knife was capable of inflicting life threatening injuries under the circumstances of its use." *Cobb*, 22 Wn. App. at 223 (emphasis omitted).

In *Cobb*, we held that the State presented sufficient evidence of a deadly weapon where a knife with less than a three inch blade produced a cut over the sternum bone, a cut to the forehead, and a cut in the muscle of the left arm. *Cobb*, 22 Wn. App. at 223. Although these injuries were not life threatening, we reasoned that a reasonable jury could have found that the knife was a deadly weapon in part because it could "inflict a penetrating wound to the chest cavity and endanger major structures." *Cobb*, 22 Wn. App. at 223-24.

Likewise, in *State v. Thompson*, 88 Wn.2d 546, 564 P.2d 323 (1977), the defendant used a pocketknife with a blade two to three inches in length to assault the victim during a robbery. The defendant held the knife against the victim's neck, and the victim sustained bruises on her right arm and a cut on her neck. *Thompson*, 88 Wn.2d at 550. Given these circumstances of the knife's use, our Supreme Court held that the jury could have properly found that the knife was a deadly weapon. *Thompson*, 88 Wn.2d at 550.

Here, the only evidence of the size of Berrian's knife was Morriel's estimation that it was "about two inches." 3 VRP at 86. Thus, the knife was not per se a deadly weapon under RCW 9.94A.825.

The circumstances in which Berrian used the knife, however, demonstrate that the State presented sufficient evidence for a rational jury to properly find beyond a reasonable doubt that the knife was a deadly weapon. The trauma surgeon who treated Morriel testified that the location

of Morriel's wound, near the diaphragm, was "concerning" and that it is possible to have a wound to the chest which penetrates "all the way into the abdomen." 2 VRP at 75. She further explained that a stabbing injury like Morriel's could have punctured a lung. Morriel experienced immediate "bleeding around the lung," which meant that the knife penetrated deep enough to cause muscular bleeding in the chest cavity. 2 VRP at 77.

Following his initial treatment, Morriel continued to experience shortness of breath. Morriel underwent surgery to clear a clot that had formed around his lung. If Morriel had not sought medical treatment for the clot, the injury would have been life threatening. Morriel testified that he still could not take deep breaths. Thus, the State provided sufficient evidence that Berrian used the knife in a way that could have easily produced Morriel's death. Therefore, a reasonable jury could have found that Berrian was armed and assaulted Morriel with a deadly weapon.

## SAG ISSUES

Berrian raises two issues in his SAG that we do not address on the merits. First, Berrian claims that the informant's testimony was inadmissible hearsay. Assuming that Berrian is referring to the testimony of the Pierce County jail informant, Berrian does not identify which portion of the informant's testimony he believes was inadmissible hearsay, and he does not provide further argument on why this testimony was inadmissible. To the extent that the informant's testimony consisted of hearsay, however, the out of court statements that he testified to were Berrian's own words and were thus admissible. ER 801(d)(2) (party opponent's statements are not hearsay).

Second, Berrian claims that "[t]he State refused to introduce any Georgia State statutes [that] may be found to be comparable to any Washington State statutory language." SAG at 2.

Our State Supreme Court has held that a defendant's "affirmative acknowledgment" that prior out-of-state convictions are properly included in his or her offender score satisfies the State's burden to prove comparability of prior out-of-state convictions. *State v. Ross*, 152 Wn.2d 220, 230, 95 P.3d 1225 (2004) (emphasis omitted). Berrian's judgment and sentence includes two prior Georgia convictions in his criminal history and, at the sentencing hearing, Berrian did not dispute the calculation of his offender score. 4 VRP at 134-35 ("The Court: Is there any quarrel with the calculation of Mr. Berrian's offender score? [Defense counsel]: No, Your Honor."). Thus, Berrian has waived this claim of error.

Berrian raises five additional issues in his SAG. All of these claims of error fail.[4]

I. PHOTOMONTAGE

Berrian first argues that the trial court erred by admitting the second photomontage from which Morriel identified Berrian as his assailant. Berrian claims that the trial court erred when it admitted the photomontage because (1) admission of the photomontage violated his right to due process, (2) the identification procedure was conducted while he was in custody, and (3) Martin's

---

[4] Berrian also argues that irregularities at trial prevented him from having a fair trial and thus we should overturn the jury's verdict, citing CrR 7.5(a)(5). Other than his assignments of error, Berrian does not specify what irregularities justify reversing his conviction. Because the trial court did not err in any of the claims Berrian raises in his SAG, and the trial proceeding below otherwise appears to be fair, public, and proper, this claim also fails. RAP 10.10(c).

comment that Morriel may have been "right about being wrong" was tantamount to witness tampering.[5] 3 VRP at 130. The trial court did not err by admitting the photomontage.[6]

A. DUE PROCESS

Berrian argues that the trial court violated his right to due process and abused its discretion when it denied his motion to suppress the photomontage, which he argues was improperly suggestive. Berrian also argues that the trial court violated his right to due process because it failed to adequately discuss the rules applicable to admitting photomontage evidence, requiring him to argue that the photomontage was suggestive.[7]

An out-of-court identification of a suspect using a photomontage violates a defendant's right to due process if the procedure was "'so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification.'" *State v. Vickers*, 148 Wn.2d 91, 118, 59 P.3d 58 (2002) (quoting *State v. Linares*, 98 Wn. App. 397, 401 989 P.2d 591 (1999)). Due process concerns arise in the context of an eye witness identification only when an identification procedure

---

[5] Berrian also argues that the photomontage was "harmfully prejudicial and toxic" to his "burdens and presumptions." SAG at 12. To the extent that this argument is not an extension of Berrian's due process arguments, this claim of error fails because Berrian did not object to the photomontage below under prejudice grounds. Thus, he failed to preserve it. *State v. Hamilton*, 179 Wn. App. 870, 878, 320 P.3d 142 (2014) ("Even if a defendant objects to the introduction of evidence at trial, he or she 'may assign evidentiary error on appeal only on a specific ground made at trial.'" (quoting *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007)).

[6] Berrian notes that he "has not been provided with a copy of any of the trial court['s] order, minute entries," or other relevant materials "to better focus the issues." SAG at 20. Berrian cites RAP 9.11, which allows us under certain circumstances to direct the trial court to take additional evidence before we decide a case. This rule does not apply here.

[7] Berrian further argues that the trial court abused its discretion in "overlook[ing] the well established" law on this issue. SAG at 13. Because admission of the photomontage did not violate Berrian's right to due process, the trial court did not abuse its discretion.

is both suggestive *and* unnecessary. *State v. Sanchez*, 171 Wn. App. 518, 573, 288 P.3d 351 (2012).

Berrian repeatedly asserts that the trial court shifted a burden onto him to disprove suggestiveness of the photomontage before requiring the State to prove the necessity of the evidence. We disagree. Washington State case law is clear that when challenging the admissibility of an identification from a photomontage the *defendant* first carries the burden to establish impermissible suggestiveness. *Vickers*, 148 Wn.2d at 118. If the defendant fails to meet this burden, the inquiry ends. *Vickers*, 148 Wn.2d at 118. However, if the defendant meets this burden, the trial court then considers, based on a totality of the circumstances, whether the procedure "created a substantial likelihood of irreparable misidentification." *Vickers*, 148 Wn.2d at 118. When deciding the admissibility of a suspect identification, the trial court must ensure that the identification is reliable by evaluating "the witness's opportunity to observe the suspect, the accuracy of any prior descriptions, the witness's level of certainty, and the passage of time." *State v. Collins*, 152 Wn. App. 429, 434, 216 P.3d 463 (2009).

Berrian cannot demonstrate that Martin's second photomontage, from which Morriel identified Berrian, was impermissibly suggestive. All eight photographs in the photomontage were booking photographs of black males who appeared to be the same general age. Although Berrian's facial expression in the montage is somewhat unusual, Martin deliberately chose the other seven photographs to prevent Berrian's photo from standing out.[8] As the trial court reasoned, Berrian's

---

[8] Martin chose two individuals with their mouths closed and two individuals with their mouths open; for each of these discrete categories, Martin chose two photos of inmates with orange uniforms and two inmates with gray uniforms.

photograph is not so unusual so as to "leap off the page." CP at 86. Thus, the trial court properly denied Berrian's motion to suppress the photomontage because it was not impermissibly suggestive. Therefore, the trial court need not have explicitly discussed necessity, contrary to Berrian's argument.

We also disagree that the trial court failed to consider applicable law on this issue and that it was uninterested in an in depth discussion. Both defense counsel and the State provided full briefing on the issue. At the CrR 3.6 hearing, the trial court noted that it had read the parties' briefs on the motion and asked counsel to focus on the suggestiveness of the photomontages. This request does not mean that the trial court ignored applicable case law. Furthermore, the trial court holds broad inherent power and statutory authority over courtroom operations. *State v. Lormor*, 172 Wn.2d 85, 93, 257 P.3d 624 (2011). The record reflects that the trial court did not abuse its discretion in asking counsel to focus on a particular issue.

B. IN-CUSTODY IDENTIFICATION

Berrian also argues that the photomontage was inadmissible because Martin should have used a line-up instead because Berrian was in custody. We disagree.

Berrian relies heavily on *State v. Thorkelson*, which explained previous dicta by our Supreme Court that "disapproved of the use of photographic identification procedures when a suspect is in custody," favoring a lineup procedure instead. *State v. Thorkelson*, 25 Wn. App. 615, 618, 611 P.2d 1278 (1980). Division Two of this court declined to follow the *Thorkelson* reasoning. *State v. Royer*, 58 Wn. App. 778, 782, 794 P.2d 1325 (1990). "'[A] photographic identification conducted while a defendant is in custody, although not favored, will be suppressed only if it is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable

misidentification.'" *Royer*, 58 Wn. App. at 782 (quoting *State v. Weddel*, 29 Wn. App. 461, 473, 629 P.2d 912 (1981)). This holding is nearly identical to our Supreme Court's current rule on the admissibility of photomontages. *See Vickers*, 148 Wn.2d at 118.

Berrian also relies on *State v. Nettles*, which disapproved of the specific photographic identification procedure used in that case. *State v. Nettles*, 81 Wn.2d 205, 207, 209, 500 P.2d 752 (1972) (in an investigation involving two suspects, victim was shown only four photographs two weeks before trial, two women and two men; one of the photographs of the men was one defendant and one of the women was the other defendant). The *Nettles* court described a favored procedure:

> The witness should be shown the pictures of a number of possible suspects. The pictures of those suspects upon whom police suspicion has alighted at the time should not be particularly distinguishable from the other photographs shown to the witnesses; nor should any words or actions on the part of the police indicate the "favored" suspect.

*Nettles*, 81 Wn.2d at 210.

According to Martin's testimony at trial, the favored procedure in *Nettles* is precisely the procedure Martin used in the two photomontages. Martin included multiple photos of individuals that were not "particularly distinguishable" from each other, and another detective unfamiliar with the investigation presented the photos to Morriel so as to ensure Martin's conduct was not suggestive. *Nettles*, 81 Wn.2d at 210. As concluded above, the trial court properly denied Berrian's motion to suppress because this procedure was not impermissibly suggestive. Thus, Berrian's claim that the photomontage must be suppressed because he was in custody fails.

C. WITNESS TAMPERING

Lastly, Berrian argues that the trial court erred in admitting the second photomontage because Martin's comment that Morriel's uncertainty in his pick from the first photomontage may have been correct was equivalent to witness tampering. No evidence on the record suggests that Martin's conduct amounted to witness tampering.

Witness tampering, among other actions, is an attempt to influence a witness to testify falsely.[9] *State v. Williamson*, 131 Wn. App. 1, 6, 86 P.3d 1221 (2004), as amended (2005). In a prosecution for witness tampering, the State is entitled to rely on both the literal meaning of the words used to influence the witness as well as inferences from the words and the context in which they were used. *State v. Rempel*, 114 Wn.2d 77, 83-84, 785 P.2d 1134 (1990).

The record does not contain any evidence that Martin attempted to influence Morriel to testify falsely or that supports an inference that Martin engaged in witness tampering. Martin's comment about Morriel's uncertainty did not suggest a specific person that Martin believed Morriel should choose from the second photomontage. Nor did Martin's comment suggest that Morriel should withhold testimony. In fact, the admonishment that Morriel read before looking through the photomontages instructed him to not guess and that the photographs were not meant to influence his judgment. Martin did not threaten Morriel or direct him to pick a certain individual from the montage. Thus, Berrian's claim of witness tampering fails.

---

[9] RCW 9A.72.120 provides that a person is guilty of witness tampering when he or she "attempts to induce a witness . . . or a person whom he or she has reason to believe may have information relevant to a criminal investigation . . . to: (a) [t]estify falsely or . . . to withhold any testimony; or . . . (c) [w]ithhold from a law enforcement agency information which he or she has relevant to a criminal investigation."

No. 46687-2-II

II. PUBLIC TRIAL

Berrian next argues that the trial court violated his right to a public trial when it considered a jury question "in camera" without applying the *Bone-Club*[10] factors.[11] SAG at 3. We disagree.

A criminal defendant's right to a public trial is guaranteed by our state and federal constitutions. U.S. Const. amend. VI; Wash. Const. art 1, § 22. We analyze whether the trial court impermissibly closed the court room according to a three-step framework. *State v. Love*, 183 Wn.2d 598, 605, 354 P.3d 841 (2015). First, we ask whether the defendant's right to a public trial attaches to the particular proceeding at issue. *Love*, 183 Wn.2d at 605. Second, if the public trial right attaches to the proceeding, we ask whether the courtroom was closed. *Love*, 183 Wn.2d at 605. Lastly, we ask if the courtroom closure was justified. *Love*, 183 Wn.2d at 605. The appellant carries the burden to prove the first two steps while the proponent of the alleged closure carries the burden to prove the third step. *Love*, 183 Wn.2d at 605.

The right to a public trial attaches to the trial court's handling of a jury question. *See State v. Koss*, 181 Wn.2d 493, 501, 334 P.3d 1042 (2014) (addressing appellant's claim that the trial court impermissibly closed the courtroom when it did not discuss the jury's question on the record). Thus, Berrian has met his burden on the first step of the public trial framework. *Love*, 183 Wn.2d at 605.

---

[10] *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).

[11] Although Berrian did not object to the alleged courtroom closure below, he may raise his right to a public trial for the first time on appeal. *State v. Shearer*, 181 Wn.2d 564, 569-70, 334 P.3d 1078 (2014).

20

However, Berrian cannot meet his burden on the second step of the framework, whether the courtroom was actually closed to the public. *Love*, 183 Wn.2d at 605. The record does not reflect that the trial court addressed the jury's question in a closed courtroom. Thus, Berrian's claim fails.

III. JURY INSTRUCTIONS

Berrian next argues that the State was relieved of its burden to prove every essential element of first degree assault because the trial court did not properly instruct the jury.[12] By shifting the "preliminary burden of proof" onto the defense by not receiving testimony on the photomontage procedure, Berrian argues that the trial court could not have accurately instructed the jury on the elements of the charged crime. SAG at 20. We disagree.

We review challenges to the legal sufficiency of jury instructions de novo. *State v. Walker*, 182 Wn.2d 463, 481, 341 P.3d 976, *cert. denied* 135 S. Ct. 2844 (2015). Jury instructions that relieve the State of its burden to prove every essential element of the charged crime are not legally sufficient. *Walker*, 182 Wn.2d at 481.

The to-convict jury instruction on first degree assault in this case is identical to WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL, 35.02. *Cf.* 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL, 35.02 at 452 (3d ed. 2008) (WPIC 35.02) and CP at 152. The Washington Pattern Instruction on first degree assault mirrors the statutory

---

[12] Defense counsel accepted the State's proposed jury instructions without objection because they were "straight out of the [Washington Pattern Jury Instructions]." 4 VRP at 66. However, because the due process clause requires the State to prove every element of the charged offense beyond a reasonable doubt and a jury instruction that relieves the State of its burden is an error of constitutional magnitude, Berrian may raise challenges to the jury instructions for the first time on appeal. *State v. Ridgley*, 141 Wn. App. 771, 779, 174 P3d 105 (2007).

elements of first degree assault.[13]   *Cf.* WPIC 35.02 and RCW 9A.36.011.   The to-convict instruction twice told the jury that it must find every element listed in the jury instruction beyond a reasonable doubt.  Thus, nothing in the to-convict jury instruction on first degree assault relieved the State of its burden to prove every element of the charged crime beyond a reasonable doubt. The legal sufficiency of this jury instruction is unrelated to the admissibility of the photomontage, which as we held above the trial court properly admitted.  Therefore, Berrian's claim of error fails.

IV. EFFECTIVE ASSISTANCE OF COUNSEL

Finally, Berrian argues that his trial counsel was ineffective for failing to propose a self-defense jury instruction because Morriel was intoxicated and the testimony of the State's witnesses was conflicting.[14]   Because Berrian was not entitled to a self-defense jury instruction and trial counsel's request for such an instruction would have been futile, his claim of error fails.

---

[13] WPIC 35.02 provides that the jury should be instructed on the elements of first degree assault as follows:

> To convict the defendant of the crime of assault in the first degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about(date), the defendant assaulted(name of person);
> (2) That the assault was committed [with a firearm] [or] [with a deadly weapon] [or] [by a force or means likely to produce great bodily harm or death];
> (3) That the defendant acted with intent to inflict great bodily harm; and
> (4) That this act occurred in the State of Washington.
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
> On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

[14] Berrian further assigns error to his trial counsel's performance "for not challenging the State" on the issues he raises in his SAG.  SAG at 2.  Berrian's counsel objected to introduction of the photomontage, which constitutes the majority of Berrian's argument in his SAG.  Because we hold that the remaining claims of error in Berrian's SAG fail for various reasons, we do not further consider Berrian's claim that his counsel was ineffective on these issues.

A. STANDARD OF REVIEW

Under our state and federal constitutions, a criminal defendant has the right to effective assistance of counsel. *State v. Jones*, 183 Wn.2d 327, 339, 352 P.3d 776 (2015). To prevail on a claim that trial counsel was ineffective, the defendant has the burden to establish (1) that counsel's representation was deficient by falling below an objective standard of reasonableness and (2) a reasonable probability that the result of the proceeding would have been different if counsel had been effective. *Jones*, 183 Wn.2d at 339.

Our review of an attorney's performance is "highly deferential." *State v. Humphries*, 181 Wn.2d 708, 720, 336 P.3d 1121 (2014). If trial counsel's conduct may be considered a legitimate trial tactic, his or her performance is not deficient. *Humphries*, 181 Wn.2d at 720. To overcome our presumption that trial counsel's performance is reasonable, a defendant bears the burden to establish the absence of a legitimate trial tactic that explains trial counsel's performance. *State v. Hamilton*, 179 Wn. App. 870, 879-80, 320 P.3d 142 (2014). We review the reasonableness of counsel's performance by considering all the circumstances surrounding counsel's trial decisions. *Hamilton*, 179 Wn. App. at 879.

B. SELF-DEFENSE INSTRUCTION

A defendant is entitled to a self-defense jury instruction when he or she produces "some evidence" of self-defense. *State v. Walden*, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997). Once the defendant does so, the burden shifts to the prosecution to prove the absence of self-defense beyond a reasonable doubt. *Walden*, 131 Wn.2d at 473. "Evidence of self-defense is evaluated 'from the standpoint of the reasonably prudent person, knowing all the defendant knows and seeing all the

defendant sees.'" *Walden*, 131 Wn.2d at 474 (quoting *State v. Janes*, 121 Wn.2d 220, 238, 850 P.2d 495 (1993)).

No evidence on the record demonstrates that Morriel was the first aggressor in the fist fight at gas station, which would have put Berrian in a position to defend himself. Instead, Morriel testified that he intervened in an argument between Berrian and a store clerk. According to Morriel's testimony, one of the men arguing with the clerk, Berrian, swung at him after he tried to calm the situation. The fist fight between Morriel and Berrian ended and Morriel began to walk away, but Berrian, ran back to him and stabbed him with a knife. There is no evidence in the record that Berrian acted in self-defense, and thus Berrian was not entitled to a self-defense instruction.

Morriel's level of intoxication, alone, is not sufficient to justify a self-defense instruction without "some evidence" that Berrian acted in self-defense. *Walden*, 131 Wn.2d at 473. Nor would inconsistent witness testimony justify the need for a self-defense instruction without evidence that Berrian's conduct was justifiable self-defense. The testimony at trial did not establish that Berrian was entitled to a self-defense instruction because he did not produce any evidence of self-defense. Therefore, defense counsel's request for a self-defense instruction would have been futile. Berrian's counsel was not deficient for failing to request such an instruction.

CONCLUSION

We hold that the State presented sufficient evidence of intent to cause great bodily harm, Berrian was armed with a deadly weapon, the trial court did not err in admitting the photomontage, the trial court did not close the court room when it answered the jury's question, the trial court's

No. 46687-2-II

jury instructions were not improper, and Berrian received effective assistance of counsel. Therefore, we affirm his conviction and deadly weapon sentence enhancement.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

WORSWICK, P.J.

LEE, J.